WIRUM & CASH, ARCHITECTS, C. Harold Wirum, and Mary Lou Wirum, Appellants/Cross–Appellees,

v.

Larry CASH, Appellee/Cross–Appellant.

No. S–3680, S–3691.

Supreme Court of Alaska.

May 22, 1992.

Sarah J. Tugman, Cathleen Nelson McLaughlin, Tugman, Clark & Ray, Anchorage, for appellants/cross-appellees.

Michael E. Kreger, W.D. Bennett, Krissell Crandall, Perkins, Coie, Anchorage, for appellee/cross-appellant.

Before RABINOWITZ, C.J., and COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

## I. INTRODUCTION

This appeal and cross-appeal arise out of the relative contractual and fiduciary duties of C. Harold Wirum and Larry Cash, past partners in the architectural firm of Wirum & Cash, Architects.

## II. FACTS

C. Harold Wirum and Larry Cash executed a written agreement on or about December 31, 1982, forming the partnership of Wirum and Cash, Architects (W & C). At that time, Wirum had been a practicing architect for approximately thirty years; Cash had been employed by Wirum

for six years as an architect at Harold Wirum & Associates (HWA).

Wirum had a 75% ownership interest in W & C and Cash had a 25% interest. Cash agreed to pay $250,000 for his interest; he was to pay this amount from his share of the profits of the partnership, pursuant to a buy-in agreement. Specifically, 75% of Cash's 25% share of the profits in excess of his $60,000 per year draw were to be applied to reduce the buy-in obligation. The remaining amount was income for Cash. Cash agreed to pay interest on the unpaid balance of the $250,000 at the prime rate plus 2%.

Pursuant to the partnership agreement, the initial working capital of the partnership was $150,000.[1] Each partner's capital account consisted of his initial capital contribution increased by any additional capital contributions made. The agreement provided, "[t]o the extent that a partner contributes more than his percentage of the profits to the capital he shall be entitled at the end of each year to receive interest computed monthly upon the excess capital contribution in an amount calculated by using the prime rate of interest plus 2%...."

Wirum was designated managing partner and had "exclusive authority to manage and control all phases of the business." As such, Wirum delegated responsibility to his wife, Mary Lou Wirum. Mary Lou Wirum supervised the business and accounting functions of W & C. She had done the same at HWA.

On January 6, 1986, Wirum gave Cash notice of his retirement effective July 1986. Cash was informed by his attorney that the partnership owed Wirum $1.5 million from the partnership assets under the retirement provisions of the partnership agreement. On March 3, 1986, Mary Lou Wirum gave both Wirum and Cash a memorandum indicating that Cash also had a negative capital account of approximately $85,000. Cash understood that this amount had to be paid within sixty days of Wirum's effective retirement. The memorandum also informed Cash that he still owed all of the $250,000 against the buy-in, plus approximately $72,000 in interest. Moreover, it stated that W & C owed Wirum $210,304 for interest on capital contributions that Wirum had lent to the firm. Cash also understood that Wirum would be entitled to 75% of the accounts receivable and work in progress as of the day of retirement within thirty days of receipt thereof. Moreover, under Paragraph 27 of the partnership agreement, Wirum was entitled to receive the credit balance of his capital account, which was $113,261.25, within sixty days of retirement.

Cash claims he relied upon the accuracy of the information provided to him by Mary Lou Wirum in the March 3, 1986 memorandum and concluded it would be a financial hardship, if not an impossibility, to make the payments demanded. Therefore, on March 24, 1986, Cash gave notice of his withdrawal from the partnership, effective May 31, 1986. When asked at trial why he decided to withdraw, Cash stated,

> Because ... nothing in the partnership had worked, and the information that I'd been ... provided by Harold or Mary Lou indicated that ... I had a substantial negative capital account of about $85,000 that I owed; $250,000 of the principal on the buy-in, and another $72,000 in interest; that ... the firm owed Harold $210,000 in interest accrued for loans that he had made to the firm, and ... in addition to all of those things, the commitments required by Harold's retirement was added to it.... [I]t was sort of like a black hole ... that had started from the ... day that I became a partner until the day that I left. I continued to work harder and harder and go further and further into the hole, and this was the only way that I could see to stop that. So, I made the decision to withdraw.

Wirum then told Cash that the partnership elected to make Cash's withdrawal effective March 31, 1986.

---

**1.** At the partnership's inception, Cash's capital contribution was $16,000 and Wirum's was $48,000, not including the depreciated cost tax basis of Wirum's furniture, equipment and books worth $83,671.

The partnership agreement contained a non-competition clause.[2] After Cash left the firm, during the clause's two year period, he submitted bids and obtained work from the Corps of Engineers, a client of W & C at the time of withdrawal, for a fee of $400,000. He also solicited work from the Corps for a project valued at $5–10 million, although he was not awarded that contract until after the non-competition clause expired. The U.S. Postal Service also hired Cash for a fee of $200,000 during the clause's effect.

On December 11, 1986, Wirum and W & C instituted suit against Cash, requesting, *inter alia,* that Cash's accounts be charged with all paid, as well as accrued but unpaid operating expenses, but not credited with any accrued but uncollected accounts receivable for work in progress. Wirum and W & C also requested judgment of $156,-465.84 for money owed to Wirum given Cash's negative balance in his capital drawing accounts. Thereafter, Cash filed a lawsuit against Wirum and Mary Lou Wirum. He alleged, *inter alia,* breach of contract, breach of contract for improper maintenance of partnership books, fraud, negligent misrepresentation, breach of fiduciary duty, breach of the duty of good faith and fair dealing, that the partnership agreement should be rescinded given misrepresentations of Wirum's prior earnings, and that the non-competition clause was void and unenforceable as a covenant restricting competition.

Subsequently, on March 12, 1987, Wirum also filed for declaratory judgment and a preliminary injunction relating to the enforcement of the non-competition clause. A preliminary injunction was granted enjoining Cash from competing in violation of the non-competition clause. However, the court did not enjoin Cash in relation to an initial term of an extant contract with the U.S. Post Office, nor for the $400,000 contract with the U.S. Corps of Engineers, because Wirum did not submit qualifications for either of those contracts and the contracts were to be completed in approximately three months.

The matters then proceeded to trial without a jury. Prior to final argument, Cash moved to expunge part of Paragraph 27 of the partnership agreement. The relevant portion states that a withdrawing partner is liable for "all items of accrued expense and prepaid expenses." The Wirums opposed the motion as untimely, and requested that they be allowed to submit further opposition memoranda if the court was to consider Cash's motion.

Thereafter, the court issued its decision, finding numerous breaches of fiduciary duty by Wirum.

This court concludes that the evidence at trial established that Wirum breached his fiduciary duty to Cash by treating the partnership as his private entity and not as a partnership; by his failure to ensure that the books of W & C were properly and accurately maintained; by permitting the commingling of W & C and Wirum personal funds; by permitting prepayment in 1982 of 1983 expenses without benefit or justification; by permitting W & C to pay without Cash's knowledge (a) personal expenses such as the fees to attorney McLaughlin and accountant Lind for advice on the partnership agreement; (b) payment of accountant fees for personal financial advice; permitting the manipulation of expenses and income at year-end 1983 and 1984; by permitting unsupported, excessive and unreasonable interest to be assessed on purported "loans" from the Wirums to W & C and the payment thereof; permitted overpayment of monies to HWA for accounts receivable; permitting the underpayment of labor costs for work done by W & C on Wirum's personal apartment projects and the non-payment of overhead costs attributable thereto; by not devoting full-time and attention to W & C in 1983, 1984, and 1985; by permitting W & C bookkeepers to devote an

---

2. Paragraph 16 of the agreement read, in part, If any partner withdraws or is expelled from the partnership he shall not perform services for a client of the partnership, past or present, or a client of Wirum's architectural practice as a sole practitioner, for a two year period thereafter without the consent of the other partners.

excessive amount of time to the activities of the Wirum personal business entities; and by permitting the deposit of W & C funds into a Wirum personal money market account and not crediting the interest earned to W & C.

The superior court expunged the disputed portion of Paragraph 27, finding it an unenforceable penalty clause. In the Wirums' favor, the superior court concluded that Cash was not entitled to rescission of the partnership agreement, as he had an adequate remedy at law; that Cash violated the non-competition clause by contracting with the U.S. Corps of Engineers for the $400,000 project; and that the covenant not to compete did not violate public policy.

The superior court also awarded damages to both parties: Wirum recovered $99,962 and Cash $118,447, netting Cash $18,485. Wirum's award was composed of $50,000 for the profit Cash made on the Corps of Engineers contract which violated the non-competition covenant; $10,112 which was 25% of W & C accounts payable as of March 31, 1986; and $39,850 which was Cash's negative balance on his W & C capital account as of March 31, 1986. Cash's award was composed of $5,000 which was 25% of $20,000 in payments incorrectly made to Wirum and his personal entity by W & C; $44,681 which was 25% of the accounts receivable as of March 31, 1986; $21,285 which was 25% of 1986 prepaid liability and workers' compensation insurance; and $47,481 which was the sum Cash paid Wirum under the buy-in agreement.

Cash was also awarded $19,779 in prejudgment interest, $146,400 in Civil Rule 82 attorney's fees and $39,526.28 in Civil Rule 79 costs. Cash's total judgment was for $205,705.28. Wirum and his wife, Mary Lou Wirum, were held jointly and severally liable for this amount. This appeal and cross appeal followed.

Based upon our review of the record and the parties' arguments, we have concluded (principal holdings only): 1. That the superior court's findings of fact concerning the following matters are supported by substantial evidence and are not clearly erroneous: (a) Wirum's breaches of his fiduciary duties, (b) loans made by Wirum to Wirum & Cash, (c) pre-payments, year-end accounting and tax reporting, (d) commingling by Wirum, (e) misrepresentations by Wirum, (f) damages awarded to Cash (with the exception of one element of damages which is remanded for clarification); 2. That the question of the enforceability of paragraph 27 should be remanded for a determination as to whether Wirum's breaches excused performance by Cash (in the event the superior court determines that Cash is not excused the superior court is to hold a hearing as to whether paragraph 27 constitutes a penalty clause and is therefore unenforceable); 3. That the issue of the enforceability of the non-compete clause should be remanded for determination as to whether Wirum's breaches excused performance by Cash; and 4. That Mary Lou Wirum is jointly and severally liable for any damages that are awarded to Cash.

## III. THE CONTROLLING FINDINGS OF FACT

### (a) *Findings Relating to Breaches of Fiduciary Duties*

Wirum claims that the superior court's findings regarding numerous breaches of fiduciary duty by him lack the requisite evidentiary support. The following relevant findings were made by the superior court, and on the basis of our review of the record we conclude that they have adequate evidentiary support and thus are not clearly erroneous.

1) After the partnership was formed and unbeknownst to Cash, the fees for Wirums' attorney ... in the amount of $20,886.02, and for his accountant ... in the amount of $2,978, for legal and accounting advice that Wirum received prior to the partnership agreement being signed by the parties were paid by Wirum out of the partnership instead of from personal funds.[3]

---

3. Cash claims that as this finding was not challenged in Wirum's opening brief, it is waived.

2) At the time of the formation of the Wirum & Cash partnership, ... Wirum and Mary Lou Wirum had very substantial investments under a number of separate entities in addition to their interest in HWA. The Wirums' personal entities were managed out of the offices of W & C using W & C personnel and facilities.... [B]ookkeepers for W & C were responsible for the books of up to 13 different entities of the Wirums.... Mary Lou Wirum represented to Cash that work performed by the bookkeepers for the Wirum personal business entities ... required only a few hours a week.... The time required ... was far in excess of a few hours a week. Bookkeepers Ms. Swartzbacker and Ms. Ward estimated that 75% of their time was devoted to Wirum personal matters. Ms. Barfus estimated that 85% of her time was spent on Wirum personal matters. Ms. Pitka estimated that her time was divided approximately 80% for Wirum entities.... Ms. Posey spent 60% to 70% of her time on the Wirum entities. Ms. Adams devoted almost her full time to Wirum personal matters.[4]

3) Wirum and Mary Lou Wirum managed W & C as though it was one of their personally-owned entities....

[F]unds of W & C were commingled with the personal funds or funds of HWA.

4) Mary Lou Wirum ... [ordered] accounting staff that any income received by W & C which was not immediately needed by W & C be deposited in an account with Merrill Lynch owned by Mary Lou and Harold Wirum. The interest earned on W & C funds in the Merrill Lynch account was not credited to W & C.[5]

5) In late December 1982, HWA prepaid expenses for 1983 totalling $103,-961.34.... This prepayment of expenses created the need for W & C to borrow money from the Wirums.... At the direction of Mary Lou Wirum, the prepaid expense cost of $103,961.34 was repaid to the Wirums by W & C during February and March 1983. Mary Lou Wirum also assessed W & C interest at a prime rate plus 2% for the amount of the prepaid expense.

6) The W & C financial records included numerous "Due To/Due From" accounts attributable to the Wirums' personal business entities and the Wirums' personal activities.... A "Due From" account is like an accounts receivable account or a loan account. It means that

---

That Wirum's accountant and legal fees were paid is supported by the record. The total appears to be approximately $20,000. W & C did not pay the equivalent fees for Cash in the formation of the partnership.

4. These diversions of partnership resources are supported by the record. Wirum contends that these costs were cleared monthly by offsets through "due-to" and "due-from" accounts.

Wirum contends he understood "overhead" to mean only "labor burden" or FICA, FUTA, and worker's compensation, and not rental costs or office expenses. This belies the clear meaning of the term. *Black's Law Dictionary* 995 (5th ed. 1979) defines overhead as "[a]ll administrative or executive costs incident to the management, supervision, or conduct of the capital outlay, or business." It goes on to say that overhead includes "office expenses."

Wirum also contends that he told Cash that the bookkeepers would work for Wirums' personal projects in exchange for Mary Lou Wirum's supervisory services. This is not supported by the agreement; the record indicates Mary Lou Wirum received free office space for her services, not free bookkeeping services.

5. The record supports that monies not needed immediately were transferred to the Wirums' personal account. Interest earned was not credited to W & C. This finding is not challenged. Rather, Wirum contends this money was due to him as a result of HWA receivables flowing through W & C, therefore he practiced good money management. Wirum cites John Rothenbueler to support his position, yet Rothenbueler's testimony acknowledges its "a very complex question" and nowhere states that the money transfers reflected perfectly the money transferred to the Merrill Lynch account. He even admitted "you can't tell ... in hindsight." Wirum also contends the amounts transferred reduced the interest W & C owed to Wirum for monies he loaned to the firm. Yet, Marianne Burke, an expert accountant, showed these transfers resulted in a loss of $99,185.16 in potential interest to W & C in 1984 through 1986. While Wirum criticizes her analysis, his attacks go to the damage amount rather than the existence of a breach. Moreover, Wirum fails to demonstrate how Burke's conclusion would differ if she considered the factors Wirum indicated she did not consider.

money is owed by some entity or person. As a loan, a "due from" as used by W & C was without interest.[6]

7) W & C recorded on its books some monies received on accounts receivable of HWA. In the course of this process, monies which should have been credited only to W & C were in fact credited back to HWA. This error amounted to approximately $13,561 not being credited as income to Cash.[7]

8) Income to HWA for accounts receivable outstanding as of January 1, 1983 received in 1983 were deposited in W & C bank accounts; the total amount of $934,532 was credited to Wirum as contributions to W & C. These "contributions" were not reasonably necessary to meet the operating capital needs of W & C in 1983 and such amounts were ... withdrawn by the Wirums and/or their entities for their personal use....

9) In December, 1983, at Mary Lou Wirum's direction a $75,000 W & C check was made payable to M.L. Wirum, Inc. This payment had nothing to do with W & C, but was recorded as a "Due From" HWA in the W & C books.[8]

10) For tax purposes, Wirum and Mary Lou Wirum were seeking to shelter as much income as they could for the year 1983. Accordingly, they had a vested, personal interest in manipulating the income and expenses of W & C to ensure a reported tax loss.... At year end 1984, Mary Lou Wirum directed that W & C withhold reporting income received and further directed that income be reported as received in January 1985.... The effect of the 1984 year-end manipulation of expenses and income was to materially distort the income of W & C. This, in turn, distorted the payment which otherwise would have been made by Cash under the Buy–In Agreement and the W & C capital accounts for Wirum and Cash.[9]

11) During 1983 and 1984, the Wirums, as the sole partners in a partnership known as the 500 Group, built two apartment projects at Anchorage.... Mary Lou Wirum, as president of M.L. Wirum, Inc. acted as construction manager for the apartment projects.... W & C provided the architectural services for the apartment projects and Wirum acted as project manager for W & C for the Apartment Projects.... W & C paid the wages of W & C employees who performed work on the apartment projects in 1983 and 1984. W & C also paid consultant bills of approximately $181,436 for work done on the apartment projects.... At year-end 1983, consultant expenses incurred by W & C were recorded as ... "Due From HWA Construction." ... At year-end 1983, some labor costs incurred by W & C during 1983 for work done on the apartment projects were recorded as ... "Due from

6. In 1984 alone, if that money had been kept in the partnership, $35,946 could have been interest earned on excess cash.

7. This is supported by the record. Wirum argues that this bookkeeping error "when dealing with millions of dollars and hundreds of transactions, is not a breach of fiduciary duty." There is no evidence, however, to show that it is a mere bookkeeping error.

8. M.L. Wirum, Inc. was the construction manager for the apartment complexes built by a Wirum entity. That company charged HWA $75,000 for the services in 1983, yet Mary Lou Wirum caused W & C to pay this expense. HWA was never charged interest on this payment. Even John Rothenbueler, Wirum's expert, could not say that this money was repaid.

9. Expenses for 1983 were posted in December 1983 but not sent out until January 1984. In that year, income received by W & C was not reported as being received in 1983, but rather as received in January 1984. This overstated expenses and understated income for W & C for 1983. In 1984, the same thing occurred. Expenses were recorded although checks were not mailed until 1985. Income was under reported, recording it instead in 1985. The distortion of W & C's income negatively affected the amount credited to Cash under the buy-in and created unnecessary excess capital contributions and interest charges for Wirum.

Wirum contends that the year end activity affected the cash income reported to IRS, not the firm's accrual income and therefore benefited both W & C and Cash. He contends it did not effect Cash's buy-in obligation. However, there is no record support given by Wirum.

HWA Construction."[10] ... During 1983 and 1984 bills for third party clients of W & C were reviewed on a monthly basis at meetings usually attended by Wirum, Cash and a bookkeeper.... The Wirums' apartment projects were not discussed at the W & C's monthly billing meetings.... The Wirums did not recognize, charge or pay any overhead cost attributable to work performed by W & C on the apartment projects owned by the Wirums....

By W & C paying the consultant fees and additional labor costs incurred by W & C for work done on the apartment projects as "Due From" entries without any interest charged to those amounts, the Wirums took interest free loans from W & C to finance the architectural costs of the apartment projects. These interest free loans were taken throughout 1983 and 1984, and into 1985.

12) The records for W & C understated the direct labor costs incurred by W & C for work done on the apartment projects in 1983 and 1984. The records of W & C further failed to accurately reflect personal expenses of the Wirums paid by W & C. The adjustment for 1983 is $64,121 and for 1984 is $41,862, reflecting additional monies owed by Wirums to W & C.... [H]ours worked by W & C personnel on the apartment projects ... were not included in the calculations of W & C for the purposes of labor costs to be reimbursed by the Wirums.[11]

13) Wirum ... had in 1983 and 1984, a priority with his apartment projects and as a result he could not devote his full time attention to W & C. Wirum devoted a substantial amount of time to his own interests in the apartment projects.[12]

14) On March 12, 1986, Mary Lou Wirum directed Ms. Niemann to draw a check from W & C payable to C. Harold Wirum for $210,295.29 for purported interest owed to Wirum for loans to W & C from 1983 through 1985. Cash was not informed of this payment while he was a partner to W & C.[13]

**10.** The court found that these billing practices were continued through mid year 1984. No interest was paid on these loans.

**11.** The record supports that W & C employees working on the apartment projects were paid by W & C. Also W & C records understate the direct labor costs incurred by the partnership for work on the apartment projects. Evidence supports the court's conclusion that Wirum did not reimburse W & C for any overhead costs attributable to work performed by W & C employees. In 1984, that amount is estimated at $29,918.

Similarly, third party consultant costs between $181,436 and $193,000 were paid by W & C. To pay this back, Wirum made "due from" entries on the accounts; these did not accrue interest for W & C. These interest free loans were taken throughout 1983, 1984, and 1985.

Finally, the record supports that the Wirums also owed W & C for expenses related to personal projects in the amount of $64,121 in 1983 and $41,862 in 1984.

**12.** This is supported by the record. An exhibit submitted by Cash showed Wirum dedicated 21% of his time to personal projects versus 37% to W & C projects in 1983, 31% to personal projects and 23% to W & C projects in 1984, 1% to personal projects and 21% to W & C projects in 1985, and none to personal projects and 28% to W & C projects in the first quarter of 1986. Again, Cash emphasizes that as Wirum did not challenge this finding in his opening brief, his arguments are waived.

However, in his cross-appellee brief, Wirum claims W & C received credit for all time spent on these projects. Yet, Rothenbueler's testimony only indicated that he computed W & C employees' contributions, not the partner's time spent on personal projects. While Cash might have known of these projects when he entered the partnership, it is unclear if Cash knew of the magnitude of time involved or, if his knowledge was relevant given that the partnership agreement stated, "Each partner shall devote substantially all of his full time, attention and best efforts to the interests and affairs of the partnership."

While Wirum says this time included time off for personal emergencies which Cash authorized, he does not detail the quantity of time this entailed.

**13.** While W & C reported a loss of $212,019 in 1983, W & C reported profits of $252,305 in 1984, $431,091 in 1985 and $96,018 in the first three months of 1986. W & C had no need to carry loans or receive excess capital contributions after February 1984. In fact, under Burke's analysis, W & C should have had excess cash which would have earned $85,572 by the end of 1985. Yet, interest due to the Wirums for loans and excess capital contributions totalled $229,064 for the partnership years, and less than half was attributable to 1983 and 1984, the time for which the firm may have needed excess capital contributions.

### (b) *Findings Relating to Pre–Payments, Year–End Accounting and Tax Reporting*

One of the specific findings of breach which Wirum challenges is the prepayment of expenses in 1982 and 1983 and the manipulation of expenses and income at year-end in 1983 and 1984. Wirum argues that the court erred in making factual findings, in applying the wrong legal standard, and by improperly shifting the burden of proof.

First, the evidence does show that in late December 1982, Wirum permitted prepayment of W & C partnership expenses for 1983, totaling $103,961.34. Some of these prepayments went to the Wirums' entities. The prepayment of these expenses was not required and did not benefit W & C. In early 1983, Wirum loaned W & C money to repay these payments. Wirum charged W & C prime plus 2% per annum for the loan. While W & C income was used in 1983 to repay the loan, interest was allowed to accrue.

■■■■ Second, Wirum states that Cash knew of the manipulation of the income and the prepayment of the expenses because Cash had access to the partnership's tax returns, books, and records. A partner only overcomes a breach of fiduciary duty if there is a full and complete disclosure to the other partner and if the breaching partner secures the other partner's approval and consent. *Skone v. Quanco Farms,* 261 Cal.App.2d 237, 68 Cal.Rptr. 26, 29 (1968). This includes a full disclosure of the fact that he or she is dealing on his or her own account and all the facts which are material to the transaction. *Starr v. International Realty, Ltd.,* 271 Or. 396, 533

P.2d 165, 168–69 (1975). Consent must be informed consent with knowledge of facts necessary to an intelligent choice. *Id.* This duty of full disclosure is especially great when the breaching partner is experienced in business compared to the non-breaching partner. *In re Stanton,* 38 B.R. 746, 752 (Bankr. 9th Cir.1984), *appeal dismissed,* 766 F.2d 1283 (9th Cir.1985).

In *Application of Lester,* 87 Misc.2d 717, 386 N.Y.S.2d 509 (Sup.Ct.1976), the question arose whether various dissenting partners ratified an agreement buying out a past partner. Although the dissenting partners knew of the agreement and were silent, the court held that only when the self-dealing partner speaks and the other has a duty to respond can silence be taken as assent. In order for there to be a ratification or estoppel, the partners need "detailed knowledge," so that "by their silence there was acquiescence, ratification or estoppel." Quoting *Trustees of East Hampton v. Bowman,* 136 N.Y. 521, 32 N.E. 987, 988 (1893), the court explained,

> But before a principal can be held to have ratified the unauthorized act of an assumed agent he must have full knowledge of the facts, so that it can be said that he intended to ratify the act. If his knowledge is partial or imperfect, he will not be held to have ratified the unauthorized act, and the proof of adequate knowledge of the facts should be reasonably clear and certain.

*Application of Lester,* 386 N.Y.S.2d at 514.

■■■■ In the case at bar, merely presenting the books to Cash was not sufficient, especially as the information contained in them was erroneous.[14] Moreover,

In March 1986, a check was drawn for interest owed to Wirum for loans to W & C from 1983 to 1985 in the amount of $210,295.29. The loans were unnecessary. Rather, the true interest that was due was $5,466 for the original excess capital contribution plus $11,228 for working capital loans in 1983. The interest should have been $816 for working capital loans in 1984. There should have been no interest due for 1985 or 1986.

Janet Niemann, a CPA and firm bookkeeper, prepared computations on interest due Wirum for providing operating capital to the firm for 1983–85. She determined that $210,295 was

due Wirum and a check for this amount was paid to Wirum. The calculations of interest during this period were based on contributions passing through the accounts of W & C rather than on what was reasonably necessary to meet the operating capital needs of W & C. Touche Ross did an accounting for the firm and determined the correct amount should have been $94,369. Wirum agrees an error was made and it should be corrected.

**14.** There is no explicit requirement in Alaska's Uniform Partnership Act that any books be kept, although it is arguably implicit in AS 32.-05.140 (location and access to partnership

Burke, the expert accountant, testified that the partnership records were very complex:

[This made] it extremely difficult to determine the financial position of the partnership at any point in time; it made it difficult to identify what was income to the partnership; it made it difficult to determine what working ·capital was actually needed by the partnership at any point in time; it made it difficult to determine what amounts were owed, if any, to either the Wirum entities or to Wirum & Cash at any point in time.

In fact, the superior court found,

[b]ecause Wirum as the managing partner of W & C failed to assure that W & C was run as a complete and separate entity from the Wirums' other 13 personal entities, it became necessary for accountants for both parties to do a complex accounting reconstruction of the financial position of W & C, as well as the financial status of each partner, by the application of complex accounting theories, principles and assumptions.

Here merely presenting the books does not constitute full disclosure for an informed consent. Lack of a full disclosure substantiated Cash's testimony that he did not know the interest Wirum claimed was due until he received the March 3, 1986 memorandum. Moreover, for some improprieties, such as year end manipulation of expenses, the superior court found that "Mary Lou represented to Cash that what had been done was what was always done, was proper, and was approved by their accountants."

■ The Wirums also argue that the superior court erroneously shifted the burden of proof and applied the wrong legal standard in judging these management decisions. They claim the standard is whether such decisions were made in good faith for legitimate business reasons. Cash argues

that fiduciaries do not discharge their burden of proof as to the propriety of their conduct by proving a legitimate business purpose.

■ Generally, partners are not liable to the partnership for failure to use ordinary skill and care in the supervision and management of business because "harm to the partnership is frequently outweighed by the need to give the partner sufficient leeway to exercise discretion on behalf of the partnership;" however, a partner may be charged with losses resulting from acting in a self-interested manner or in violation of the agreement. *Bromberg & Ribstein on Partnership*, § 6.07(f), at 6:85–6. Alaska recognizes the business judgement rule. *See Alaska Plastics, Inc. v. Coppock*, 621 P.2d 270, 278 (Alaska 1980); *Betz v. Chena Hot Springs Group*, 657 P.2d 831, 835 (Alaska 1982).

■ In a case that involves both an exercise of the managing partner's discretion *and* self-dealing, we adopt the higher standard to judge that partner's actions. *See Bassan v. Investment Exchange Corp.*, 83 Wash.2d 922, 524 P.2d 233, 237–38 (1974). The need to exercise discretion does not excuse the managing partner's fiduciary duties. *See Labovitz v. Dolan*, 189 Ill.App.3d 403, 136 Ill.Dec. 780, 786, 545 N.E.2d 304, 310 (1989) (Despite a partnership agreement giving a general partner wide discretion in deciding whether or not to distribute cash to the limited partners, the general partner "still owed his limited partners a fiduciary duty which necessarily encompasses the duty of exercising good faith, honesty and fairness in his dealings with them and the funds of the partnership."). Consequently, the allegation of self-dealing invokes the higher burden and it is allocated to the breaching partner. Here, given the litany of fiduciary breaches the superior court found, the superior court

books) and AS 32.05.150 (duty of partners to provide information). However, once Wirum chose to keep books, they needed to be adequate. *Bromberg and Ribstein on Partnership*, § 6.05(b), at 6:53. Otherwise, the partnership may be deemed to have breached the duty to disclose. *Rogers v. Stacy*, 63 N.M. 317, 318 P.2d 1116 (1957); *Jackson v. Jackson*, 343 Ill.App. 31,

98 N.E.2d 169 (1951). Clear financial records delineate the parties' individual interests and deter self-dealing and mismanagement by providing a monitoring mechanism. *See Bromberg and Ribstein on Partnership*, § 6.05(a), at 6:52–3. *See also*, Frankel, *Fiduciary Law*, 71 Cal.L.Rev. 795, 826 (1983).

did not err in its conclusion that the actions in question were taken to benefit Wirum at the expense of the partnership, or Cash. Therefore, we hold that the allocation of the burden and the standard by which the superior court evaluated Wirum's behavior was not error.[15]

(c) *Findings Concerning Loans Made From Wirum to Wirum & Cash*

Burke performed a cash flow analysis showing that Wirum's practices caused an unnecessary need for excess cash. Burke testified that the interest legitimately owed to Wirum was $11,228 for his working capital contributions in 1983, $5,450 for his excess capital contributions in 1983, and $816 in working capital loans in 1984. Yet, the following amount of interest was calculated as being owed to Wirum for loans and excess capital contributions: $44,036.90 in 1983; $50,940.63 in 1984; $106,325.71 for 1985; and $19,089.51 for January and Feb-

ruary 1986. The discrepancy occurred because money received on account of HWA projects totalling $934,532 was commingled with income of W & C and credited to Wirum as a "contribution." Therefore, interest was calculated based on HWA contributions passing through the W & C accounts, rather than on what was reasonably necessary to meet W & C's operating needs.[16] Burke called these contributions unnecessary. Based on income actually earned and received, W & C had no need to carry loans or receive excess capital contributions from Wirum after February 1984.

Wirum argues that the evidence does not support a finding that excessive loans were made or that the partnership could have operated with no cash reserves. Specifically, Wirum argues the following: that Cash's witness, Burke, was not qualified as a business expert, but only as an auditor; that Cash agreed that initial working capi-

**15.** Wirum claims that he acted in good faith. However, a finding of the absence of good faith is implicit in a finding that a fiduciary breach occurred. *Froemming v. Gate City Federal Sav. and Loan Ass'n,* 822 F.2d 723, 731 (8th Cir.1987). In *Froemming,* the court said,

> Good faith in turn depends upon the knowledge, understanding, and intent of the partner who is charged with breach of fiduciary duty, as well as the understanding, knowledge, and intent of his co-partners. It also depends upon the circumstances of whatever action is alleged to be a breach of duty. Necessarily, the determination of whether an action is undertaken in good faith requires the factfinder to weigh the credibility of the witnesses, gauge nuances of voice and expression, and sift through competing and conflicting versions of what occurred and what state of mind each actor brought to the occurrence. *Id.*

As to the specifics, the superior court found that the prepayment of expenses did not benefit W & C, but created a need for the partnership to borrow from the Wirums. Wirum claims that this was clearly erroneous. The Wirums claim the partnership would have had to borrow from a bank and no evidence existed that W & C had the funds to pay the first two months rent and parking from partnership income. Cash does not specifically respond to this argument. However, the superior court appears to have considered Wirum's contention in finding a breach. It acknowledged that W & C needed additional working capital during the first few months of its existence, but not after 1984.

The superior court found that the year-end tax reporting system diminished Cash's ability to

pay off his buy-in obligation. Wirum claims that "it reduced the principal that Cash had to pay Mr. Wirum on his buy-in." Cash seems to accept this argument and calls it "false comfort." He claims, rather, that he may not have withdrawn had the profits been fairly represented. It is clear, in any event, that the practice created unnecessary working capital loans and interest charges, and it caused Cash to owe $45,000 more on his capital accounts and an additional $48,000 on the buy-in. The finding that Wirum had a personal interest in manipulating W & C's income was not clearly erroneous.

As to the capital account, Wirum argues that Cash never paid his negative balance and that tax deferral procedures catch up eventually. Cash responds that he never received the benefits of the partnership and the superior court charged him for his share of the partnership's capital accounts in its damage award. While Cash undoubtedly received some benefit from the partnership, the superior court did award Wirum $39,850 which was Cash's negative balance of his capital account as of March 31, 1986.

**16.** The interest owed by W & C to Wirum based on the amount passing through in 1983 amounted to $52,729.73. A bookkeeper later computed the correct amount to be $44,037. Another bookkeeper, however, used the $52,729.73 figure to compute interest for 1984, 1985, and part of 1986. From 1983 until March 1986, $229,064.52 was calculated as interest accruing on loans made to W & C by Wirum. Wirum now admits an error was made and should be corrected.

tal of the partnership would be $150,000 cash; and that Cash acknowledged he would need operating capital in the amount of $250,000 and the firm's accounts receivable to continue the firm alone.

■ While Wirum challenges Burke's qualifications, Burke was a Price Waterhouse Certified Public Accountant. The superior court accepted Burke as an expert C.P.A., "specifically to testify in areas of accounting and audit ... in accounting." Burke explained that one of the duties of an accountant "is to advise on good business practices." She provides business consulting to clients which includes cash flow management.

Burke explained her methodology. Burke performed a cash flow analysis, examining all accounting records. This included books of original entry, invoices, memorandums that refer to or support numbers in books of original entry, and tax returns. It also included the partnership agreement. She completed this type of analysis for her other clients as well. While she admits not having experience in running an architectural firm, she could see trends within W & C itself that supported her conclusions. For example, in testifying that funds received at the end of 1983 were not deposited in a reasonable time, she explained,

> based on an analysis that I performed, it's clear that the receipts as recorded in the accounting records are less toward the end of a calendar year than the typical amount deposited for other months, and that there are large deposits made in January. It's my opinion that these funds did not, they were not received in the same way they were recorded in the accounting records.... If you look at the deposits, the income as recorded in the general ledger on a monthly basis, you will see a drop in deposits toward the end of the year and a significant increase the following January.

The trial involved extensive testimony by the Wirums' accountants, John Rothenbueler and Ron Lind, as well as the testimony of Burke on Cash's behalf. The amount of weight to give to a witnesses' testimony is in the sound discretion of the trial court. Civil Rule 52(a); *Associated Eng'rs & Contractors, Inc. v. H. & W. Constr. Co., Inc.*, 438 P.2d 224 (Alaska 1968). Wirum's witness Rothenbueler admitted that he did not determine whether the loans were reasonably necessary. He conceded, however, that "the bookkeepers ... didn't have a good handle on what the cash balances were." Burke questioned parts of Rothenbueler's analysis. Overall, we conclude that the superior court did not err in heavily crediting Burke's testimony.[17]

Evidence exists in the record that Wirum never determined the amount of loans reasonably required to meet W & C's capital needs. When asked if the money lent was necessary to meet the operating expenses of W & C, Wirum responded, "that was up to the bookkeepers. They had the freedom ... to draw the money whenever they needed it." When asked if he ever reviewed whether the bookkeepers borrowed money only when necessary to meet the partnership's operating expenses, he stated, "I personally never did...." Yet, neither did Mary Lou Wirum ever direct the bookkeepers to calculate loans on what was reasonably necessary for W & C to meet its operating capital needs.[18] When the $210,-295 check was drawn, representing interest on loans from 1983 through 1985, Wirum did not try to determine if this amount was the correct amount owed to him. He said, "This check just came in and was deposited. That's about all I can say. I didn't think about it at all." The superior court found this interest charge was substantially and materially erroneous.

### (d) *Findings Regarding Commingling*

■ The superior court found,

---

17. However, Burke admitted she did not perform an audit in accordance with generally accepted auditing standards on the W & C financial statements.

18. However, Mary Lou Wirum claims she herself undertook to determine what loans were reasonably necessary for W & C to meet its operating capital needs.

The evidence clearly established that at significant times, Wirum and Mary Lou Wirum managed W & C as though it was one of their personally-owned entities instead of a completely separate partnership entity. As a result, funds of W & C were commingled with the personal funds or funds of HWA.

Wirum argues that the records contained all the information needed for an accounting or an audit to be done. He contends that if adequate records are kept, the commingling of accounts is not a breach of contract or of fiduciary duty. In our view this argument fails.

As Cash argues, the breach was not poor record keeping, but managing the funds for Wirum's own interest. For example, the superior court noted that Mary Lou Wirum

> order[ed] accounting staff that any income received by W & C which was not immediately needed by W & C be deposited in an account with Merrill Lynch owned by Mary Lou & Harold Wirum. The interest earned on W & C funds in the Merrill Lynch account was not credited to W & C.[19]

Similarly, when HWA money was commingled with W & C money in 1983, it was entered as a contribution, for which Wirum received interest.

This type of commingling constitutes a breach of fiduciary duty. *See Glazer v. Kurman,* 384 Pa. 283, 120 A.2d 892, 894 (1956) ("Defendant kept the books of the company and he alone had the power to draw checks. He mingled partnership funds and personal funds in one bank account and, on this one account, drew checks to pay both partnership obligations and his own personal obligations. It requires no citation of authority to support the proposition that defendant's conduct amounted to a breach of the fiduciary duty which one partner owes to another.").

### (e) *Findings Relating to Misrepresentation*

In its findings of fact relating to misrepresentation the superior court stated,

> Harold and Mary Lou Wirum represented to Cash during partnership negotiations that Harold's architectural practice had averaged a net income of $500,000 during the five-year period 1978 through 1982. At the time of this representation, both Harold and Mary Lou Wirum knew that the net income of $500,000 was derived not only from Harold's architectural practice but was in fact his net income from all his entities and investments.

> Based on the Wirums' representations that the $500,000 per year was income from Harold's architectural practice, Cash proceeded with the negotiations of a "buy in" into the firm.

Wirum argues that this finding caused the superior court to rescind the buy-in, awarding $47,481 paid in under it. He also argues that Cash failed to prove the elements necessary to avoid the buy-in contract on the grounds of fraud or misrepresentation, as the record did not support the finding that misrepresentations were made regarding the value of the business, or that Cash's reliance on any such statements was reasonable. Cash, however, argues that the trial court did not rescind the buy-in or award Cash damages on his claim of negligent misrepresentation.

As noted above, the superior court found numerous breaches of fiduciary duties, and emphasized all of them in its conclusions of law. Given the purposes of our remand, which is discussed below, we need not reach this issue since, if on remand the superior court determines that Wirum's breaches of fiduciary duties were material, Cash would be excused from further performance of the buy-in agreement.[20]

---

**19.** Testimony of Susan Monsen, an accountant who worked at W & C, supports that these deposits were made. Testimony from Margaret Ward, a bookkeeper at W & C, supports that the interest earned was not returned to W & C.

**20.** Arguably sufficient evidence exists to support a finding of misrepresentation. Most significantly, Cash testified that he believed HWA was making an average of $500,000 per year for the last five years based on "[r]epresentations that had been made to me during the partnership negotiations ... both verbally and in written

#### (f) *Findings Relating to Damages Awarded Cash*

Wirum claims that he cannot tell from where the court drew its damage figures. Wirum asserts, therefore, that the damage award cannot be adequately reviewed. Wirum, however, does not specify any particular error. Nevertheless, we will briefly review the evidentiary bases for the damage findings.

(i) "$5,000 which is 25% of $20,000 payments incorrectly made to 500 L Group and to C. Harold Wirum by W & C"

The $20,000 in payments incorrectly made by W & C to Wirum's entities was actually composed of $16,000 paid to the 500 L group and $4,000 paid to Wirum personally. Burke found, in journal entries 634 and 720, that both of these amounts receivable had been deducted from the books twice. The double deductions meant,

> [a]s detailed on Exhibit GV, we have now reduced those two accounts twice. We have reduced it and zeroed it out at the end of June so that at the end of June, ... the general ledger showed that they [entities of 500 L Group and personal] did not owe any monies to the partnership of Wirum & Cash. The third journal entry in fact creates an amount that the partnership owes to those entities by changing it from a receivable to a payable.

This amount was then credited to the respective entities. W & C was therefore due $20,000, 25% of which represented Cash's share.

(ii) "$44,681.00 which is 25% of accounts receivable as of March 31, 1986."

W & C accounts receivable were $178,723 as of March 31, 1986. This amount was earned while Cash was a partner. W & C itself provided the document from which this figure was generated. Cash's award of $10,112 was arrived at by deducting Cash's share of the questioned payments to consultants from his 25% share of the accounts receivable. The evidence supports this offset.

(iii) 25% of 1986 prepaid liability and workers' compensation insurance ... Larry Cash's share of this amount is $21,285"

The superior court stated, "Since W & C existed only for the first three months of 1986, Larry Cash is entitled to recover his share of prepaid liability and workers' compensation insurance, paid for all of 1986." For 1986, professional liability insurance cost $104,172 and workers' compensation insurance cost $9,349. Prepaid expenses for the nine months remaining in 1986 after Cash's withdrawal amounted to $85,140 for professional liability and workers' compen-

documentation." The verbal representations were made by Wirum and Mary Lou Wirum in 1982. While Wirum contends that this "self-serving testimony" as to Cash's subjective belief is not probative, Cash's testimony is corroborated. A letter to a loan officer signed by Wirum and Cash, and typed by Mary Lou Wirum stated, "Wirum's last five years earning as a *sole practitioner* have averaged $500,000/year. Wirum's experience at start-up of his sole practice was a negative cash basis profit in Year 1, a positive (to approximately equal the Year 1 negative) cash basis profit in Year 2." (Emphasis added.) Also, a letter from Wirum to a potential partner stated, "Prior to forming the partnership my earnings had been in the $500,000 annual range. It should be stressed that for the future partnership to continue to generate these type earnings (sic) will take an overall-team-management effort ... in which case, the monetary benefits are there." Although these letters were written on March 19, 1985 and October 25, 1984 respectively, after the partnership was formed, they corroborate Cash's allegations of misrepresentation. Also, attorney Thomas McLaughlin wrote in December 17, 1982, that the assumption was earnings from the new partnership would be $500,000 per year, which could be applied to Cash's buy-in obligation. This assumption was based on a letter addressed to McLaughlin and Touche Ross & Co. from Mary Lou Wirum on December 15, 1982. Mary Lou Wirum's letter does contain some ambiguity because it does not affirmatively state that the $500,000 figure is only from Wirum's architectural practice:

> Instead, in the agreement Larry and Harold will agree that for purposes of computing the retirement, death or disability pay, Wirum's agreed five consecutive full highest years will be a minimum of $500,000/year. The retirement, death or disability pay payment formula to Wirum will be based upon this figure unless Wirum has higher earnings following the formation of the partnership.

sation insurance. Twenty-five percent of $85,140 amounts to $21,285.

> (iv) "$47,481 which is the sum Cash paid to Wirum under the terms of the buy-in agreement."

Cash argues he lost this amount when he forfeited his interest in the partnership due to Wirum's breach of his fiduciary duties. Yet, the tax returns Cash and Burke cite as supporting the $47,481 do not indicate that Cash paid this amount in compliance with the terms of the buy-in agreement. Moreover, Wirum argues the math is wrong. Upon remand the superior court is directed to clarify this issue by entering additional findings of fact and, if necessary, modified conclusions of law.

## IV. WAS PARAGRAPH 27 AN UNENFORCEABLE PENALTY CLAUSE?

Upon Cash's notice of withdrawal, Wirum told Cash that Cash owed $68,915.75 for payables accrued prior to Cash's withdrawal, pursuant to Paragraph 27.[21] On October 7, 1988, after the parties had rested but before final arguments commenced, Cash requested that the court find Paragraph 27's clause "all items of accrued expense and prepaid expenses" to be an unenforceable penalty clause. Wirum opposed the motion as untimely, and requested that the court allow him to address the merits with further memoranda if the court was going to consider it. The superior court did not respond to the question of timeliness or allow further briefing. In its findings, it held,

> Under the provisions of Paragraph 27 of the partnership agreement, a withdrawing partner is charged with all prepaid,

as well as accrued but unpaid operating expenses, including a proportionate share of normal fiscal year-end expenses and he is not entitled to receive "any amount for accounts receivable or work in progress." These provisions requiring Cash as the withdrawing 25% partner to pay all prepaid as well as accrued but unpaid operating expenses, including a proportionate share of normal fiscal year-end expenses and the same time for him not to be entitled to receive any amount for accounts receivable is clearly an unenforceable "penalty". These contract provisions fixing damages in advance of a partner's withdrawal are intended to penalize a withdrawing partner [and] do not constitute an enforceable liquidated damage clause. Under the facts of this case where the majority and managing partner of the partnership breached his fiduciary duty of good faith and fair dealing owed to a minority partner, a penalty clause that has no relation to what actual losses the partnership suffered by the minority partner's withdrawal is unenforceable.

The superior court awarded Cash $44,681, constituting 25% of the accounts receivable as of March 31, 1986, and $21,285, representing 25% of 1986 prepaid liability and workers' compensation insurance. Wirum questions the timeliness of Cash's argument, the lack of an evidentiary hearing, and the absence of critical findings by the court.

Wirum claims that Cash's motion was untimely; he argues that the pleadings did not address the concept of "reformation" or "expunging" a part of the partnership

---

21. Paragraph 27 reads:

*Payments to Withdrawn or Expelled Partner.* A former partner who has withdrawn or been expelled from the partnership shall be entitled to receive the following amounts and no others, provided the former partner has complied with all the provisions of this agreement; (i) The credit balance of his capital account; (ii) The credit balance of his drawing account.

The books and records of the partnership shall be closed at the end of the month in which the withdrawal or expulsion occurs. A computation of capital and drawing accounts shall then be made in the same manner as at

the end of each quarter and so will reflect as operating expenses all items of accrued expenses and prepaid expenses. Accrued expense shall include a reasonable provision for a proportionate share of normal fiscal year end expenses.

... No other amounts or benefits shall be payable to a withdrawn or expelled partner including any amount for accounts receivable or work in process. Such measures are agreed upon to compensate the partnership for its costs and losses arising from the withdrawing or expulsion of the former partner. (Emphasis added.)

agreement, nor was it addressed at trial. Cash responds that while he briefed the legal defense after the close of evidence, the enforceability of Paragraph 27 was an issue in the pleadings and throughout the trial because the Wirums sought money damages based on Paragraph 27. We answer these contentions in alternative fashion since we have concluded that the question of the enforceability of paragraph 27 should be remanded to the superior court for additional findings of fact and conclusions of law.

It is a basic principle of contract law that a contract breach may excuse further performance. On this point, the superior court failed to make the necessary determinations whether, under a contract analysis Wirum's breaches of his fiduciary duties excused Cash's performance of his obligations under paragraph 27. Thus, on remand the superior court should enter additional findings and conclusions as to whether Wirum's various breaches, discussed above, were material breaches of the parties' contract. *Restatement (Second) of Contracts*, § 237, comment d; § 241 (1981); *Howard S. Lease Constr. Co. v. Holly*, 725 P.2d 712, 715–16 (Alaska 1986).[22]

In the event the superior court determines that none of Wirum's breaches relieved Cash of his obligations under paragraph 27, we hold that the superior court abused its discretion in refusing to allow Wirum to brief the issue of whether paragraph 27 constituted an unenforceable penalty clause and therefore should be expunged. Cash did not assert in the pleadings that paragraph 27 constituted an unenforceable penalty clause. Furthermore, review of the record persuades us that this issue was not tried with Wirum's consent. This penalty clause issue was raised for the first time after Wirum had rested his case.[23] In brief, Wirum was never afforded the opportunity to present countervailing evidence or to argue the matter fully.[24]

## V. THE NON–COMPETE CLAUSE

Cash argues that Wirum is not entitled to enforce the non-compete clause because Wirum's breaches of fiduciary duties discharged Cash's further obligations under this clause.

Wirum argues that he breached no duty to Cash, and that any breaches were not wilful or material. Wirum argues that Cash voluntarily left the firm because of the amount of money he was required to pay upon Wirum's retirement and stresses that Cash received the benefits which he reasonably could have expected based on the partnership agreement. Wirum also argues that Cash can be adequately compensated if a breach occurred, and that Wirum will suffer an unjust and unnecessary forfeiture if Cash is excused.

Given the remand we discussed above as to the enforceability of paragraph 27 we think a similar disposition is called for as to this issue. We therefore remand the question of the enforceability of the non-compete clause for the purpose of permitting the superior court to enter additional findings of fact and conclusions of law as to whether Wirum's breaches were material and whether such material breaches excused Cash from any obligations he had under the provisions of the non-compete clause.

In the event the superior court on remand determines that Wirum's breaches did not relieve Cash of his obligations under the non-compete clause we will address the parties' arguments regarding the supe-

---

**22.** *Compare with Obert v. Environmental Research & Devel. Corp.*, 112 Wash.2d 323, 771 P.2d 340, 341 (1989).

**23.** *Barrett v. Byrnes*, 556 P.2d 1254, 1255 (Alaska 1976) (no implied consent exists when an issue is raised for the first time after plaintiff has rested his case).

**24.** Cash additionally argues that the superior court's findings relating to Wirum's breach of contract and fiduciary duties constituted a finding of unclean hands and thus "are complete defenses to Wirum's claims on the non-competition clause." The doctrine of unclean hands is an equitable remedy. Here we conclude that the superior court did not abuse its discretion in failing to apply the doctrine.

rior court's rulings pertaining to the non-compete clause.

### (i) Postal service contract

■ The superior court found "Cash did not violate the 'non-competition' clause by entering into a contract with the United States Postal Service within two (2) years of March 31, 1986, because Wirum did not submit a bid on the Postal Service contract." In essence, the superior court approved Judge Joan Katz's preliminary injunction, refusing to enjoin Cash from completing the contract for Phase I of the project because Wirum had not attempted to obtain the contract. Cash, citing *Data Management, Inc. v. Greene,* 757 P.2d 62 (Alaska 1988), claims both Judge Katz and Judge Gonzalez adopted a rule of reasonableness in their interpretation of the clause. He also emphasizes that these clauses are disfavored and Wirum had not submitted a bid. Wirum responds, however, that the superior court should have looked at whether Cash's contract was with a W & C or HWA client, and not whether Wirum had placed a bid on that particular contract.

Based on the language of the partnership agreement, we conclude that Wirum's argument has merit. Paragraph 16 of the agreement reads,

No partner shall directly or indirectly engage in competition with the business of the partnership as described in paragraph 5. *If any partner withdraws* or is expelled for the partnership *he shall not perform services for a client of the partnership, past or present, or a client of Wirum's architectural practice as a sole practitioner, for a two year period*

*thereafter without the consent of the other partners.*

A partner may engage in other enterprises which do not conflict or compete with the business or interest of the partnership and a partner need not offer such business opportunities to the partnership or the other partners.

(Emphasis added.) The U.S. Postal Service was Cash's client, as well as a former client of W & C. The U.S. Postal Service contract provided total fees of $200,000 and was entered into within two years of leaving the partnership. Judge Katz, ruling for Wirum on the preliminary injunction, acknowledged "that contacts have been made which, at least on the face of the noncompete agreement, violate that agreement, and those more specifically are the contacts and the contracts with the Postal Service and Corps of Engineers."

■ Cash claims that Wirum did not submit a bid on this project. Yet, this factual issue is irrelevant given the plain language of the clause.[25]

### (ii) Corps of Engineers Contract [26]

■ Cash has a contract to perform architectural services for a dining facility for the U.S. Corps of Engineers at Fort Wainwright, valued at $5–10 million. Wirum alleges that Cash solicited work for this project during the non-compete period. The Corps of Engineers was Wirum's client for twenty five years, including at the time Cash withdrew. Wirum claims he submitted for the Corps job and was "shortlisted"; he believed he had a good chance of getting it. However, the project was put on hold and Cash obtained the actual award after the two year non-compete period expired. Wirum alleges that the trial court

---

**25.** Cash also emphasizes that Judge Katz reasonably interpreted the clause. Yet, there is no showing that the clause here is "unreasonable" given the factors to be considered. *Data Management,* 757 P.2d at 65. A predicate to the court altering an overbroad covenant not to compete to render it enforceable (based on what restrictions would be reasonable between the parties) is that the overbroad covenant was drafted in good faith. *Data Management,* 757 P.2d at 64.

**26.** There are two different Corps projects mentioned in the appeal. One was a project done for $400,000 during the non-compete period. The court found a violation of the non-compete clause and awarded Wirum $50,000. This is the subject of Cash's cross-appeal, *infra.* The Corps project under discussion here was a project at Fort Wainwright solicited during the non-compete period. The superior court made no finding as to whether or not this violated the non-compete clause.

erred by not awarding damages for this breach. The court made no finding as to whether this action violated the clause.

Cash responds that the Corps contract did not commence within the two-year term of the non-competition clause, but six months later. Cash cites Judge Katz's ruling at the preliminary injunction that the clause would only be construed to prevent Cash from "competing" where the "effective date of any contract would fall within the two-year period," because one needs to treat such clauses restrictively. *See De-Cristofaro v. Security Nat'l Bank*, 664 P.2d 167, 169 (Alaska 1983).[27]

In our view Cash has the more persuasive position. While the Corps of Engineers first solicited the statement of qualifications on the project in September 1987, and Cash submitted a bid in October 1987, Cash was only selected for the project on January 6, 1988. At the date of trial, August 30, 1988, no negotiations had occurred, no contract was signed, no work was performed, nor was a proposal predicate to negotiating the fee for services prepared. Simply, no services had been "performed," which is what the partnership agreement prohibited.

While an allegation existed that collusion delayed the project, Claude Vining, assistant chief of the engineering division of the Alaska District Corps of Engineers, testified that it was not an unusual period of time between the solicitation and selection. He explained that "our user [the Army] has not authorized us to complete the project." Vining denied that the Corps and Cash agreed to delay work on the project. Cash also denies it.

(iii) Contracts with the United States

Cash submitted a statement of qualifications for a U.S. Army Corps Engineers architectural services contract and was selected for negotiations. The Corps ultimately awarded him an indefinite delivery of architectural services contract. He performed approximately $250,000 in architectural services on the contract, yet he was unable to identify his profit. The superior court awarded Wirum $50,000 representing the profit the court determined that Cash made on this contract. Wirum testified that he also bid on this contract, although conflicting evidence existed.

At the preliminary injunction hearing, Judge Katz allowed Cash to continue to perform the contract to its completion. Judge Katz found that Wirum had not submitted qualifications for the contract and Cash's performance under it was likely to be finished in two or three months. Judge Katz did not issue a preliminary injunction.

> Mr. Cash is in midstream on that job, and Mr. Wirum did bid on that particular option—at least he thinks he probably did. That one will apparently run out at about the same time that the noncompete clause itself expires. I think here, because there is a potential for serious harm to Mr. Cash's reputation should he effectively breach his contract by breaking it off in the middle, since there's a harm to his employees potentially if this contract not be completed, I am not going to enjoin him from continuing with the Corps contract for this particular year.

At trial on the merits, superior court Judge Gonzalez found that Cash had violated the non-compete clause by contracting with the Corps to perform architectural services within two years of March 31, 1986 for "a client for whom HWA and/or W & C had done work." The superior court found the clause "not unreasonably restrictive nor is it violative of public policy."

Cash argues that a restraint on his ability to contract with the United States, e.g. the Army Corps of Engineers, is unreasonable because it eliminates "ordinary competition," as opposed to competition which would be unfair to W & C. Cash emphasizes that the competitive federal proce-

---

**27.** Cash also states that no findings concerning violation of the non-competition clause were necessary given this language and because no contract was formed during the relevant period. The superior court did find that the preliminary injunction was well founded in law, adopting the original court's reasoning.

dures for procuring architectural services exist.

We reject Cash's argument. Cash places much emphasis on *Data Management, Inc. v. Greene,* 757 P.2d 62 (Alaska 1988). First, *Data Management* addressed an overbroad covenant not to compete. *Id.* at 64. Here, there is no finding that the covenant is too broad.

Second, the language in *Data Management* that Cash emphasizes, the distinction between "whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition," is just one factor among nine that are listed. *Id.* at 65. Other factors, such as "whether the covenant operates as a bar to the employee's sole means of support," and "the absence or presence of limitations as to time and space," indicate that the clause is reasonable. *Id.* at 65. This conclusion is reenforced by our reference to U.C.C. § 2–302 which indicates that the clause must be unconscionable in order to alter the covenant. *Data Management,* 757 P.2d at 65.

Even assuming that Cash is correct on the procedures for obtaining Corps contracts, other courts have refused to place the public's interest in competitive bidding on public projects ahead of a partner's obligation not to compete. *See Leff v. Gunter,* 33 Cal.3d 508, 189 Cal.Rptr. 377, 384, 658 P.2d 740, 747 (1983) (en banc) (partner still violating continuing duty not to compete with partnership even though partner withdrew). Moreover, Judge Katz found that "there is no evidence that enforcement of the covenant not to compete against Cash is likely to cause significant harm to public interest." [28]

### (iv) Damages awarded under the non-compete clause

■ Finally, Cash argues that the superior court incorrectly measured Wirum's damages for Cash's breach of the non-compete clause by Cash's expected profits. Cash claims that Wirum had to prove some actual damages. Wirum responds that the trial court did not award damages based on Cash's profit. Rather, it considered Cash's profit as evidence of Wirum's loss. Wirum further contends that if the court awarded Wirum Cash's profit, it is legally supportable.

Cash offers no authority for his argument. Wirum, by contrast, convincingly argues that a court can consider the profit of the breaching party. In *National Bank of Alaska v. J.B.L. & K of Alaska, Inc.,* 546 P.2d 579, 590 (Alaska 1976), we held, "[t]he measure for breach of a covenant not to compete is generally not the profits earned by the breaching party asserting the breach." We cited to *Merager v. Turnbull,* 2 Wash.2d 711, 99 P.2d 434, 439 (1940), which held that the defendant's profit may be considered in evidence if shown to correspond in whole or in part to plaintiff's loss for impairment of good will. Other courts have found that the breaching party's profits can be a reasonable basis for estimating plaintiff's damages. *See North Pac. Lumber Co. v. Moore,* 275 Or. 359, 551 P.2d 431, 435–36 (1976); *Dunn v. Ward,* 105 Idaho 354, 356, 670 P.2d 59, 61 (Idaho App.1983).[29]

**28.** The superior court found,

Cash violated the "non-competition" clause by contracting with the Corps of Engineers to perform architectural services within two (2) years of March 31, 1986. Wirum submitted a bid with the Corps of Engineers and Cash competed with Wirum.

Cash claims Wirum never submitted a bid with the Corps of Engineers on this project.

Cash's argument lacks merit. First, as Wirum argues, the evidence conflicted on this point. The trial court's resolution of this dispute is not clearly erroneous. *Preferred General Agency of Alaska, Inc. v. Raffetto,* 391 P.2d 951, 952–53 (Alaska 1964). Second, and not argued by Wirum, the non-compete clause restrains Cash from doing business with a client of W & C, regardless of whether Wirum chose to bid on the project. In fact, in its conclusions of law, the superior court said "Cash violated the non-competition clause by contracting and performing work for a client for whom HWA and/or W & C had done work, the U.S. Corps of Engineers. Wirum is entitled to recover the profit of $50,000 Cash made on this contract."

**29.** Cash argues that the facts adduced at trial indicate that the injunction should not have been issued. Cash claims he should have received damages for being wrongfully enjoined.

In the event the superior court determines on remand that Wirum's breaches excused Cash

## VI. WHETHER MARY LOU WIRUM IS JOINTLY AND SEVERALLY LIABLE FOR DAMAGES ASSESSED AGAINST WIRUM

■ The superior court found that, Mary Lou Wirum owed a fiduciary duty to the partnership of Wirum & Cash and to Larry Cash because she was entrusted to manage money belonging to the partnership and to keep accurate records for the benefit of both partners and not for the primary benefit of C. Harold Wirum, her husband and herself.... Mary Lou Wirum breached her fiduciary duties owed to Larry Cash.

Wirum argues that inadequate findings of fact exist to show that Mary Lou Wirum had agreed to act on Cash's behalf. Wirum alternatively argues that assessing liability for damages assessed against himself and against Mary Lou Wirum, as well, was error because only Wirum was party to the partnership and buy-in agreement.

Mary Lou Wirum should be held jointly and severally liable. The superior court held that "the evidence in this case proved that Mary Lou Wirum had substantial interwoven interests with C. Harold Wirum in the acts and transactions involved in this litigation." This factual finding is not clearly erroneous. The court lists "[a] few [twenty-six] of the facts which support [its] conclusion." The superior court found that while Wirum was managing partner, "in actual practice, at all times during its existence, Wirum delegated this responsibility to Mary Lou Wirum who undertook the responsibility for and supervised the business and accounting functions of the partnership." Mary Lou Wirum herself said,

For the past 30 years, I have been intimately involved in the organizational and financial matters of Wirum & Cash, Architects, and of C. Harold Wirum as a sole practitioner, as well as CCWC, Architects, and Maynard & Wirum, Architects, partnerships of which C. Harold Wirum was a member. My involvement with each entity was for the entire period of that entity's existence.[30]

Apart from the factual intertwining of actions, several legal theories support the joint and several award. First, Mary Lou Wirum assisted Wirum in committing a tort (here breach of fiduciary duty); she is therefore liable as a joint tortfeasor.

An agent who assists another agent or the principal to commit a tort is normally himself liable as a joint tort feasor for the entire damage. Thus, those who assist in the wrongful removal of chattels ... all are subject to liability together with those for whom they act, except where their good faith creates a privilege in them to act.

*Restatement (Second) Agency,* § 343 comment d (1958).[31]

The superior court's ability to join the parties is clear.

(1) Principal and agent can be joined in an action for a wrong resulting from the tortious conduct of an agent or that of agent and principal, and a judgment can be rendered against each.

*Restatement (Second) Agency,* § 217(B) (1958).

However, the *Restatement of Torts* reaches a slightly different conclusion:

A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:

. . . . .

(c) in the supervision of the activity[.]
*Restatement (Second) Agency,* § 213 (1958). Similarly,
A master or other principal who unintentionally authorizes conduct of a servant or other agent which constitutes a tort to a third person is subject to liability to such person.
*Restatement (Second) Agency,* § 215 (1958).

---

from compliance with the non-compete clause, the superior court should redetermine this issue.

30. Mary Lou Wirum was head bookkeeper. Her accounting "caused Cash's withdrawal." The superior court found, "Cash relied upon the information provided to him by the Wirums and concluded that it would be a financial hardship if not impossible to make the payments demanded by the Wirums under the partnership agreement."

31. Harold Wirum is liable for Mary Lou Wirum's errors.

A person who knowingly assists a fiduciary in committing a breach of trust is himself guilty of tortious conduct and is subject to liability for the harm thereby caused ... The measure of his liability, however, may be different from that of the fiduciary since he is responsible only for harm caused or profits that he himself has made from the transaction, and he is not necessarily liable for the profits that the fiduciary has made nor for those that he should have made.

*Restatement (Second) Torts*, § 874 comment c (1979). However, given the intertwining of Mary Lou Wirum and Wirum's actions, as well as their status as partners in other business entities and as husband and wife, Wirum's gains are indistinguishable from Mary Lou Wirum's gain.

Given these theories, we find it is unnecessary to resolve whether Mary Lou Wirum was an agent of Cash as well as the partnership, since we may affirm a trial court's ruling on different grounds than those adopted by the trial court.

## VII. MISCELLANEOUS CLAIMS OF ERROR

### (i) The buy-in agreement

Wirum argues that the superior court erred in refunding Cash $47,481 that he paid under the buy-in agreement and simultaneously, crediting Cash with the benefits of 25% ownership when he withdrew (e.g. $44,681 which was 25% of the accounts receivable as of March 31, 1986). More particularly, Wirum contends that the buy-in agreement and the partnership agreement were one contract, that the evidence did not support that Wirum knowingly misrepresented past income or that Cash's reliance was reasonable, and that the court improperly shifted the burden of proof.

Wirum asserts that the trial court treated the buy-in agreement and the partnership agreement as two separate contracts,

allowing rescission as to the buy-in agreement and a damage remedy as to the partnership agreement. He contends that a damage remedy should have been applied to both. Wirum argues that he is entitled to have the buy-in agreement enforced and to receive from Cash the remainder of the $250,000, or to have the unpaid buy-in sums subtracted from the damage award. Cash does not deny that the two agreements should be read together as one contract. Yet, he contends that the court was awarding restitution for his buy-in contributions in its damage award. Cash argues that he suffered this loss, and that Wirum derived this gain, from his breach of fiduciary duties.

Contrary to what Wirum and Cash argue, it seems that the superior court employed a reliance measure of damages.[32] However, as the measure of damages is not specified, upon remand the superior court shall clarify the precise damage theory it is applying.

### (ii) Costs and attorney's fees

Given our conclusion that a remand for certain aspects of this case is necessary we find it unnecessary to address Wirum's attack on the superior court's award to Cash of attorney's fees and costs. Depending on the superior court's resolution of the issues remanded it could conceivably make adjustments to its previous award of attorney's fees and costs.

### (iii) New trial and additional errors

In footnote 112 of his brief, Wirum claims this case should be remanded for a new trial given the overall number of errors. In that footnote, Wirum lists six alleged errors in addition to those discussed throughout this opinion. Given the cursory nature of their presentation, we decline to address them. Where a point is not given more than a cursory statement in the argument portion of a brief, the point

---

**32.** *Restatement (Second) Contracts,* § 349 (1979) provides:

Damages Based on Reliance Interest
As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest,

including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed.

**714**

will not be considered on appeal. *State v. O'Neill Investigations, Inc.*, 609 P.2d 520, 528 (Alaska 1980); *Fairview Development, Inc. v. City of Fairbanks*, 475 P.2d 35, 36 (Alaska 1970), *cert. denied*, 402 U.S. 901, 91 S.Ct. 1374, 28 L.Ed.2d 642 (1971). Furthermore, we are not persuaded that a new trial, as opposed to the limited remand called for above, is appropriate.

AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

BURKE and MATTHEWS, JJ., not participating.