STATE of Alaska, Appellant/Cross–Appellee,

v.

GREENPEACE, INC., and Arne J. Sorensen, Appellees/Cross–Appellants.

Nos. A–9363, A–9393, A–9394.

Court of Appeals of Alaska.

July 3, 2008.

Tamara E. de Lucia, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellant.

G. Blair McCune, Anchorage, for the Appellee/Cross–Appellant Greenpeace, Inc.

James D. Gilmore, Clapp, Peterson, Van Flein, Tiemessen & Thorsness, LLC, Anchorage, for the Appellee/Cross–Appellant Sorensen.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

STEWART, Judge.

In July 2004, the vessel *Arctic Sunrise* docked in Ketchikan en route to an anti-logging campaign for the environmental group Greenpeace, Inc. When the vessel arrived in Ketchikan on July 12, it did not have an approved oil spill contingency plan or certificate of financial responsibility as re-quired by state law.[1] When the vessel departed Ketchikan two days later, these regulatory requirements still had not been met. As a result, the State charged Greenpeace, Inc., and the captain of the *Arctic Sunrise,* Arne J. Sorensen, with misdemeanor offenses for operating the vessel with criminal negligence as to whether the vessel complied with these regulatory requirements. A jury convicted Greenpeace, Inc., and Sorensen of several offenses for their conduct on July 12 and July 14. But the district court set aside those convictions after ruling they were not supported by sufficient evidence.

We agree with the district court's decisions setting aside the jury's verdicts, except for one. We conclude, after viewing the evidence and all the inferences from that evidence in the light most favorable to upholding the jury's verdicts, that there was sufficient evidence for a reasonable juror to conclude that Sorensen operated the *Arctic Sunrise* on July 14, 2004, with criminal negligence as to whether the vessel had an approved oil spill contingency plan. We therefore direct the trial court to reinstate that verdict. Because Sorensen reserved his right to litigate post-trial motions in the district court, we remand the case for further proceedings.

### Facts and proceedings

The *Arctic Sunrise,* the *Esperanza,* and the *Rainbow Warrior* are vessels commonly associated with the environmental organizations that operate worldwide under the umbrella name "Greenpeace." The vessels are owned by Stichting Phoenix, a Netherlands foundation. ("Stichting" is the Dutch word for "foundation.") Another Netherlands foundation, Stichting Marine Services (SMS), operates the vessels under "bareboat charter." That is, SMS charters the vessels from Stichting Phoenix and provides its own crew and everything else required for operation of the vessels. SMS then charters the manned vessels to its sole client, Greenpeace International, which is also headquartered in the Netherlands. Greenpeace International (formally known as Stichting Greenpeace Coun-

---

1. *See* AS 46.04.055(f); AS 46.04.055(a).

cil) owns the name "Greenpeace" and licenses that name to environmental organizations around the world, including Greenpeace, Inc., in the United States.

Greenpeace, Inc., petitioned Greenpeace International for use of the *Arctic Sunrise* to support its anti-logging campaign in Alaska. Greenpeace International approved that request and allowed Greenpeace, Inc., to use the vessel free of charge in the summer of 2004.

In June 2004, en route to Alaska, the *Arctic Sunrise* made a port call in Portland, Oregon. Richard Parkinson, the head of operations at SMS, hired Barwell Agencies, an international shipping agent, to serve as the agent for the *Arctic Sunrise* in Portland. Barwell Agencies had a preexisting agency agreement with SMS and was paid in advance for its services. As the ship's agent, Barwell Agencies's duties ranged from paying the *Arctic Sunrise's* bills in Portland, handling contacts with the United States Coast Guard, immigration and customs, arranging crew changes and berthing arrangements, and running errands on shore. Under this agency agreement, Barwell Agencies advised SMS of local regulatory requirements, but it was SMS, not Barwell Agencies, that was responsible for complying with those regulations.

Barwell Agencies arranged for a subagent to assist the *Arctic Sunrise* when it left Oregon and headed through Canadian waters to Victoria, British Columbia. Barwell Agencies also tried to secure an agent for the *Arctic Sunrise* in Ketchikan, Alaska, but was unable to do so. Local agents were apparently unwilling to work for the *Arctic Sunrise* because of its mission in Alaska: opposing logging practices in the Tongass National Forest on behalf of Greenpeace, Inc. The *Arctic Sunrise* was boldly emblazoned with the Greenpeace logo.

The master, or captain, of the *Arctic Sunrise* for the duration of this campaign was Arne Sorensen, who had worked as a master for SMS for fifteen years. Sorensen boarded the *Arctic Sunrise* in Portland. Once on board, he inventoried the ship's documents and confirmed that the ship carried a Coast Guard certificate of financial responsibility

and an international oil pollution prevention certificate.

Sorensen testified that at that time he was unaware he also needed an approved state oil spill contingency plan and proof of financial responsibility to legally operate in Alaska waters. While in Portland, in preparation for his journey to Alaska, Sorensen contacted Joel Stewart, who had captained the *Esperanza* in Alaska in 2003, to inquire about any problems he might confront in Alaska. The *Esperanza*, another Greenpeace-affiliated vessel, had complied with Alaska's regulations in 2003. But Stewart did not mention these regulatory requirements when he spoke with Sorensen.

By the time the *Arctic Sunrise* anchored in Ketchikan on the afternoon of July 12, regulators at the Alaska Department of Environmental Conservation (DEC) knew the vessel was operating without the required certificates. On the morning of July 12, after reading a newspaper article about the vessel's planned arrival in Alaska, Chris Pace of the DEC's Juneau office sent an e-mail to his colleague Robert Flint in Anchorage inquiring about the ship's regulatory compliance. Flint checked the DEC's electronic database and found that the *Arctic Sunrise* had no oil spill contingency plan on file. Flint then established that the *Arctic Sunrise* was just shy of 1000 gross tons—and therefore covered by the new nontank vessel requirements.

Flint began locating contacts for the ship. He identified ECM Maritime Services, a Connecticut company, as the response planning facilitator for the *Esperanza*, the vessel that had visited Alaska on a Greenpeace, Inc., campaign in 2003. Flint called ECM Maritime and learned that the company had not been asked to handle regulatory compliance for the *Arctic Sunrise*. However, an employee at ECM Maritime said he would contact SMS in Amsterdam. Flint also called the United States Coast Guard and obtained the name of its contact for the *Arctic Sunrise*—Willem Beekman. Finally, Flint checked the Internet for a phone number for Greenpeace, Inc., in Washington, D.C. Flint spoke with an employee there who

was aware of the *Arctic Sunrise* campaign. Flint e-mailed him information on Alaska's regulatory requirements.

The next morning, on July 13, Flint contacted Robert Fultz, who worked for a different DEC department in Ketchikan. Fultz confirmed that the *Arctic Sunrise* was moored in Ketchikan and he agreed to get in touch with Beekman. That morning, Fultz called Beekman, who expressed surprise that the *Arctic Sunrise* was out of compliance with environmental regulations. Beekman was "very cooperative" and agreed to come to Fultz's office. When he arrived, Fultz arranged a conference call between Flint and Beekman. Flint explained the steps required to bring the ship into compliance with the oil spill contingency plan requirement. Flint asked Beekman to keep the vessel moored in Ketchikan until the application was approved.[2] Fultz then arranged a conference call with Chris Pace in Juneau, who handled the proof of financial responsibility component of the regulations, and Pace explained how to comply with that requirement.

Flint spoke with Beekman again later that afternoon. Flint asked Beekman about the departure plans for the *Arctic Sunrise* and Beekman said the plan was for the vessel to leave in the morning. Flint told Beekman that the vessel might have to stay at anchor until the paperwork was completed and that he would advise him in the morning. At some point, Flint told Beekman that another option was to depart state waters and wait for approval of the paperwork.

Flint went to work at 6:00 a.m. the next day, July 14. He called ECM Maritime Services and learned that the company had been in touch with SMS in Amsterdam and would be submitting an oil spill contingency plan application for the *Arctic Sunrise*. Flint then drafted a letter to Beekman. The letter noted that the *Arctic Sunrise* was in violation of AS 46.04.055 and stated that the DEC would seek civil penalties under AS 46.03.760 if the vessel left Ketchikan without permission. The letter was signed by Flint's boss, Betty Schorr, and faxed to Beekman on

board the *Arctic Sunrise* at about 8:30 a.m. on July 14.

There were difficulties faxing the letter. Beekman finally received the letter, but was unable to fax back a signed copy from the vessel verifying his receipt. Beekman disembarked and went to the DEC office in Ketchikan, signed the letter, and faxed it to Anchorage. Beekman did not tell Sorensen, the ship's captain, about the letter or about the DEC's request that the vessel stay in Ketchikan. In fact, before Beekman disembarked the *Arctic Sunrise,* he told Sorensen the ship was "good to go." The vessel then departed Ketchikan for a prearranged publicity event in Hydaburg.

When Beekman arrived in the DEC office that morning, he spoke by phone with Flint and Schorr in Anchorage. Beekman told them he misunderstood their letter. He said he believed that once he signed the letter and finalized the contract with Southeast Alaska Petroleum Organization (SEAPRO), the oil spill response contractor, ECM Maritime could complete the final paperwork and the vessel was "good to go." (Beekman had contacted David Owings, the general manager of SEAPRO, on July 13, and had given him a check on the morning of July 14.) Flint told Beekman the approvals were not final and that the vessel should stay in port. Beekman subsequently tried to call Sorensen on the ship's mobile phone, but Sorensen could not take the call because he was maneuvering the *Arctic Sunrise* in port. Sorensen called Beekman back about one-half hour later while the ship was underway in the Tongass Narrows. Sorensen later said it was possible Beekman told him to turn around at that point, but he said he would have refused to do so in any event because the passage was narrow and visibility was poor.

Several hours later, when the ship was in Nichols Passage east of Gravina Island, Sorensen received a notice of violation from the DEC, which was faxed to the vessel. The notice was addressed to Richard Parkinson at SMS and copied to Sorensen. At about

---

**2.** Flint's request that the vessel stay in port was not memorialized in Flint's or Fultz's notes of this conversation.

the same time, the ship's radio operator gave Sorensen a copy of the letter that Flint had faxed to Beekman earlier that morning asking the ship to stay in port. Soon after, Sorensen called Schorr on the ship's mobile phone. Both Sorensen and Schorr testified that Schorr did not ask Sorensen to return to Ketchikan. However, Flint, who was listening to this call, testified that Schorr told Sorensen to return to port. Sorensen told Schorr he would proceed to his planned anchorage in Cordova Bay and remain there until the paperwork was in order.

The DEC approved the oil spill contingency plan the next day, July 15. The certificate of financial responsibility was approved the day before, July 14, though Schorr did not receive notice that the Juneau office had issued the certificate until midday on July 15.

Based on these events, the State charged Greenpeace, Inc., and Sorensen with four misdemeanor offenses: (1) operating a nontank vessel in state waters without an approved oil discharge prevention and contingency plan on July 12 and July 14 and (2) operating the vessel without proof of financial responsibility on those same days.[3] The State charged Beekman with the two July 14 offenses. The jury convicted Greenpeace, Inc., of operating without an oil spill contingency plan on July 12 (the date the *Arctic Sunrise* anchored in Ketchikan) and on July 14 (the date the ship departed Ketchikan), but acquitted it of operating without a certificate of financial responsibility on these same two days. The jury convicted Sorensen of operating without an oil spill contingency plan on July 12 and July 14 and of operating without proof of financial responsibility on July 12. The jury acquitted Beekman of all charges.

The defendants moved for a judgment of acquittal at the close of the State's evidence and again at the close of all the evidence.

District Court Judge Kevin G. Miller denied the first motion and took the second motion under advisement. After the jury returned its verdicts, the court permitted additional briefing on the issue. Judge Miller ultimately granted the motions, concluding that the State's evidence, even viewed in the light most favorable to upholding the jury's verdicts, was insufficient to show that Greenpeace, Inc., had operated the *Arctic Sunrise* or that Greenpeace, Inc., or Sorensen had acted with criminal negligence.

The State appeals Judge Miller's decision setting aside the jury's verdicts.

*Was there sufficient evidence for the jury to convict Greenpeace, Inc.?*

■ As a threshold matter, the defendants argue that the State cannot appeal Judge Miller's decision because reinstating the jury's verdicts would violate the prohibition against double jeopardy. This is wrong. We recently held in *Eide v. State*[4] that the double jeopardy clause "does not bar an appeal from a court's decision setting aside a jury's verdict."[5] We therefore address the merits of the State's claims.

■ Judge Miller granted the defendants' motions for judgment of acquittal after ruling that there was insufficient evidence as a matter of law to support the jury's verdicts. We owe no deference to that ruling.[6] As an appellate court, we view the evidence and the reasonable inferences from that evidence in the light most favorable to the jury's verdicts and decide "whether reasonable minds could conclude that guilt had been established beyond a reasonable doubt."[7]

Greenpeace, Inc., was convicted of violating AS 46.04.055(f), the statute providing that "a person may not operate a nontank vessel within the waters of the state . . . unless the

---

3. AS 46.04.055(f) and AS 46.04.055(a), respectively.

4. 168 P.3d 499 (Alaska App.2007).

5. *Id.* at 501.

6. *Cf. Guerrero ex. rel. Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 971 (Alaska 2005).

7. *Eide*, 168 P.3d at 501–02 (independently reviewing the trial court's decision to grant a motion for judgment of acquittal); *Siggelkow v. State*, 648 P.2d 611, 613 (Alaska App.1982) (independently reviewing the trial court's decision to deny a motion for judgment of acquittal); *see also Korean Air Lines Co., Ltd. v. State*, 779 P.2d 333, 338 (Alaska 1989) (independently reviewing the trial court's grant of a judgment n.o.v.).

[DEC] has approved an oil discharge prevention and contingency plan covering that non-tank vessel and the person is in compliance with the plan."[8] The State did not argue that Greenpeace, Inc., was an "operator" of the vessel as that term is defined by statute.[9] Rather, the State argued that Greenpeace, Inc., was culpable through the acts of its agents, SMS and Sorensen.

At the State's request, the court instructed the jury, in accordance with AS 11.16.130,[10] that there are two ways to convict an organization of a crime based on the conduct of an agent. First, the State can prove that the agent of the organization committed each element of the crime while acting within the scope of the agent's employment on behalf of the organization.[11] Second, the State can prove that the agent of the organization committed each element of the crime and that the organization solicited, ratified, or adopted the conduct of the agent.[12] The jury was instructed that an "agent" is a "director, officer, or employee of an organization or any other person who is authorized to act on behalf of the organization."

At trial, the State argued that Greenpeace, Inc., was guilty under the second test. The prosecutor argued that SMS was an agent of Greenpeace, Inc., that SMS acted with criminal negligence by operating the *Arctic Sunrise* in violation of AS 46.04.055, and that Greenpeace, Inc., later adopted SMS's misconduct.

■ The State offered the jury two alternative theories as to how SMS was an agent of Greenpeace, Inc. The first theory was that Greenpeace, Inc., and SMS were, in essence, one organization. The State conceded that there were four distinct legal entities: Stichting Phoenix, the Netherlands foundation that owned the *Arctic Sunrise;* SMS, which operated the boat under bareboat charter; Greenpeace International, which chartered the vessel from SMS; and Greenpeace, Inc., which successfully petitioned Greenpeace International for use of the vessel for its anti-logging campaign. But the State argued that there was really only one Greenpeace organization, which had been split into four entities as part of a "corporate shell game" to avoid liability. To prove this, the State offered evidence that SMS and Greenpeace International shared the same street address in Amsterdam, that SMS had no business other than to operate Greenpeace-affiliated vessels, and that Parkinson, the head of operations at SMS, had a Greenpeace International e-mail address.

But even accepting, for purposes of argument, that SMS and Greenpeace International—the two foundations that shared a street address in Amsterdam—were, in all but name, one organization, the State offered no evidence that any officers or employees of the Washington D.C.-based Greenpeace, Inc.—the purported principal in this case—had any authority over the officers or employees of that Netherlands organization with respect to the use of the *Arctic Sunrise*

**8.** AS 46.04.055(f) provides in full:

> On and after May 26, 2003, a person may not operate a nontank vessel within the waters of the state or cause or permit the transfer of oil to or from a nontank vessel unless the department has approved an oil discharge prevention and contingency plan covering that nontank vessel and the person is in compliance with the plan.

**9.** AS 46.04.900(16) defines "operator" as:

> "the person who, through contract, lease, sublease, or otherwise, exerts general supervision and control of activities ... [on the vessel]; the term includes, by way of example and not limitation, a prime or general contractor, the master of a vessel and the master's employer, or any other person who, personally or through an agent or contractor, undertakes the general functioning of the ... [vessel]."

**10.** AS 11.16.130 provides:

> (a) Except as otherwise expressly provided, an organization is legally accountable for conduct constituting an offense if the conduct
> (1) is the conduct of its agent and
> (A) within the scope of the agent's employment and in behalf of the organization; or
> (B) is solicited, subsequently ratified, or subsequently adopted by the organization; or
> (2) consists of an omission to discharge a specific duty of affirmative performance imposed on organizations by law.
> (b) In this section "agent" means a director, officer, or employee of an organization or any other person who is authorized to act in behalf of the organization.

**11.** AS 11.16.130(a)(1)(A).

**12.** AS 11.16.130(a)(1)(B).

or with respect to whether the *Arctic Sunrise* complied with environmental laws.

The State's second theory was that SMS was an agent of Greenpeace, Inc., because SMS (or its employee, Captain Sorensen) acted "on behalf of" Greenpeace, Inc. The State argued that Greenpeace, Inc., had "essentially delegated to these folks in Amsterdam the ... authority ... to act on their behalf to comply with these laws. If [SMS] screwed up and Greenpeace, Inc., [adopted] the conduct later, they're on the hook, too." Later, the State reiterated: "if [SMS] committed all the elements of this offense and that conduct was adopted, [Greenpeace, Inc.,] is on the hook."

■ But to prove that SMS and Sorensen were agents of Greenpeace, Inc., it was not enough for the State to show that SMS and Sorensen provided Greenpeace, Inc., with a contractual or a gratuitous service. A person or organization does not qualify as the authorized agent of a principal unless the principal controls or has the legal right to control the purported agent.[13] The State offered no evidence that Greenpeace, Inc., controlled how (or if) SMS or Sorensen operated the *Arctic Sunrise* or complied with Alaska's requirements for nontank vessels.

Indeed, there was considerable evidence to the contrary. It was SMS, not Greenpeace, Inc., that hired and paid for the ship's agent in Portland. That agent, Mitch Anderson, did not deal with Greenpeace, Inc., but with Richard Parkinson, the head of operations at SMS. Both Anderson and Sorensen, the master of the *Arctic Sunrise*, testified that it was SMS's obligation to comply with regulatory requirements for the vessel. ECM Maritime, the response planning facilitator that ultimately submitted an application for the *Arctic Sunrise*, submitted it on behalf of SMS. Ellen McPeake, the chief operating officer of Greenpeace, Inc., testified that Greenpeace, Inc., had no role in filling out regulatory paperwork for the vessel.

Beekman, a Greenpeace, Inc., employee, volunteered to act as the ship's agent while the vessel was in Ketchikan because SMS was unable to secure a professional agent in Alaska. In his efforts to bring the ship into compliance, Beekman contacted and paid a local company, SEAPRO, to provide oil spill response services. But the State offered no evidence that Beekman had any authority to direct employees or officers at SMS to comply with Alaska law.

■ Even if the State had proven that SMS and Sorensen were agents of Greenpeace, Inc., the State's evidence would fail on another ground. As noted earlier, AS 11.16.130 imposes criminal liability on an organization for the conduct of a non-employee agent if the agent's misconduct was "subsequently ratified, or subsequently adopted by the organization."[14] The legislature did not define precisely what it meant by "ratified" or "adopted." But the tentative draft of AS 11.16.130 would have imposed criminal liability on an organization for an agent's misconduct if the organization "knowingly engaged in, authorized, solicited, requested, commanded, ratified *or tolerated*" the misconduct.[15] When the legislature enacted the statute, it abandoned this broad language, "tolerated" misconduct. This strongly suggests that the legislature did not intend to impose criminal liability on an organization for merely "tolerating" an agent's misconduct. In the civil context, by comparison, the supreme court has held that a principal may ratify the conduct of an agent by silence if the principal "fail[s] to act in response under circumstances which 'according to the ordinary experience and habits of men, one would naturally be expected to speak if he did not consent.'"[16]

The State did not explain at trial or in its opening brief on appeal what specific acts by Greenpeace, Inc., it believes amounted to ratification or adoption of misconduct by

---

**13.** *Nicholas v. Moore,* 570 P.2d 174, 176–77 (Alaska 1977).

**14.** AS 11.16.130(a)(1)(B).

**15.** Alaska Criminal Code Revision Part II, at 27 (Tent. Draft 1977) (emphasis added).

**16.** *Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 117 (Alaska 1990) (quoting *Bruton v. Automatic Welding & Supply Corp.,* 513 P.2d 1122, 1127 (Alaska 1973) (quoting Restatement (Second) of Agency § 94, comment a (1957))).

SMS or Sorensen. In its reply brief, the State suggests that express ratification was unnecessary because McPeake, the chief operating officer of Greenpeace, Inc., was aboard the *Arctic Sunrise*. But the State cannot prove that Greenpeace, Inc., was responsible as a principal for violations by SMS or Sorensen simply by showing that McPeake was on board the vessel when those violations took place; adoption or ratification by a principal requires at a minimum both an awareness of the misconduct and some action to ratify or adopt the misconduct. The supreme court discussed this principle in *Wirum & Cash, Architects v. Cash,*[17] when it concluded that a partner in an architecture firm could not defeat a claim of a breach of fiduciary duty by showing that the other partner had access to the partnership's tax returns, books, and records.[18] Quoting a New York case, the supreme court explained:

> [B]efore a principal can be held to have ratified the unauthorized act of an assumed agent he must have full knowledge of the facts, so that it can be said that he intended to ratify the act. If his knowledge is partial or imperfect, he will not be held to have ratified the unauthorized act, and the proof of adequate knowledge of the facts should be reasonably clear and certain.[19]

In the alternative, the State argues that Greenpeace, Inc., ratified the misconduct because McPeake knew the vessel had no agent in Ketchikan (and thus should have been on notice that it was up to Greenpeace, Inc., to ensure the vessel's compliance) and because she allowed the vessel to depart Ketchikan without the required approvals. But McPeake did not arrive in Ketchikan until July 12, and the State offered no evidence that she knew SMS or Sorensen had failed to file the necessary papers before the vessel entered Alaska waters on that date. There was also no evidence that McPeake knew when the vessel departed Ketchikan on July 14 that it was out of compliance with Alaska law or that she knew the DEC had asked the vessel to remain in port.

The State next argues that McPeake ratified the misconduct because she learned of the violations after the vessel left Ketchikan but did not order Sorensen to return to port. But again, the State offered no evidence that McPeake was aware that the DEC had asked Sorensen to return to Ketchikan—or, if she was aware of this, that she had the authority to order Sorensen to change course.

Viewing the evidence and the inferences from that evidence in the light most favorable to the State, we conclude that there was insufficient evidence for a reasonable juror to find that SMS or Sorensen was an agent of Greenpeace, Inc. Alternatively, we conclude that the State presented insufficient evidence to show that Greenpeace, Inc., ratified any failures by SMS or Sorensen to comply with Alaska law. We therefore affirm Judge Miller's decision to set aside the verdicts against Greenpeace, Inc.

### *Was there sufficient evidence for the jury to convict Sorensen?*

The jury's verdicts against Sorensen, the master of the *Arctic Sunrise,* present a closer question. There is no dispute that Sorensen was an "operator" of the *Arctic Sunrise* as that term is defined by statute. The question is whether Sorensen was criminally negligent when he operated the vessel without an approved oil spill contingency plan and certificate of financial responsibility.

The jury convicted Sorensen of criminal negligence for operating the *Arctic Sunrise* without an oil spill contingency plan on July 12 and July 14 and for operating without a certificate of financial responsibility on July 12. Judge Miller set aside the verdicts against Sorensen after concluding that the State had not presented sufficient evidence to show he acted with criminal negligence.

■ At trial, the State argued that Sorensen was criminally negligent because he did not inquire about Alaska's regulatory requirements or take steps to comply with them before he entered Alaska waters on

17. 837 P.2d 692 (Alaska 1992).

18. *Id.* at 701.

19. *Id.* (quoting *Application of Lester,* 87 Misc.2d 717, 386 N.Y.S.2d 509, 514 (N.Y.Sup.Ct.1976)).

July 12. The State argued that Sorensen should have inquired because he knew environmental regulations varied from jurisdiction to jurisdiction and because he was on notice that the *Arctic Sunrise* had no professional ship's agent in Alaska who could alert him to local requirements. The State argued that Sorensen was criminally negligent on July 14 because he continued to operate the *Arctic Sunrise* after he was told by state regulators to return to Ketchikan until the final approvals were in place.

On appeal, the State argues—for the first time—that there was sufficient evidence for the jury to find that Sorensen had *actual notice* of the regulations before he arrived in Alaska. The State points to the following evidence to support this claim: Greenpeace International chartered the *Esperanza* and the *Arctic Sunrise* from Sorensen's employer, SMS; the *Esperanza* complied with Alaska laws in 2003; and Sorensen was the reporting party on documents supplied to the Coast Guard by SMS in preparation for the *Arctic Sunrise's* voyage. The State does not explain (nor is it readily apparent) how a juror could reasonably infer from these facts that Sorensen had actual notice of Alaska's requirements for nontank vessels. Sorensen testified that he first learned of the regulations on July 13, the day after the vessel anchored in Ketchikan. In any event, the State did not make this argument at trial. The State's argument at trial with respect to the July 12 charges was that Sorensen *should have inquired* about the regulations and was criminally negligent for failing to do so.

The jury was instructed that a person acts with "criminal negligence" with respect to a result or circumstance

> when the person fails to perceive a substantial an[d] unjustifiable risk that the result will occur or that the circumstance exists; the risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

> A person also acts with "criminal negligence" if they act "intentionally, knowingly, or recklessly".

There is no dispute about the facts the State relies on to argue that Sorensen was criminally negligent when he operated the *Arctic Sunrise* on July 12 without the required approvals from the DEC. The State observes that Sorensen was a veteran captain who had been employed by SMS as a vessel master for fifteen years. He reviewed the vessel's documentation before he departed for Alaska. He knew operating nontank vessels is a highly regulated activity and that regulations vary from region to region and change over time. He also knew that the *Arctic Sunrise* had no ship's agent in Alaska. And yet he never contacted Parkinson, SMS's operations manager, to inquire about the status of the vessel's compliance with Alaska law.

Sorensen argues that the State's claim of criminal negligence fails as a matter of law because the State offered no evidence on the standard of care a reasonable person in Sorensen's circumstance would observe. Without this evidence, Sorensen argues, the jury had no basis to find that his conduct was a "gross deviation" from that standard.

As Sorensen observes, none of the State's witnesses testified that his conduct deviated from the conduct of a reasonable master mariner. Moreover, the jury heard evidence that the vessel owner (or, in this case, SMS, the bareboat charterer) was normally responsible for regulatory compliance—not the vessel master. Sorensen testified that the operations department at SMS had the responsibility to obtain the required documentation for the *Arctic Sunrise*. Mitch Anderson of Barwell Agencies, the ship's agent in Portland, testified that in his ten years of working as a ship's agent he had never been hired by a vessel master. Anderson said he only communicated with masters about the physical operation of vessels. He said as ship's agent, he alerted the vessel owner to any special regulations and that it was the duty of the owner, not the master, to comply with those regulations.

The jury also heard evidence that DEC regulators did not normally communicate with the masters of vessels to ensure regulatory compliance. Schorr said the state relied

on response planning facilitators registered with the state (such as ECM Maritime, the company SMS hired to handle regulatory compliance for the *Arctic Sunrise*) to disseminate information on regulatory requirements. Flint and Schorr testified that they made no effort to contact Sorensen about the vessel's noncompliance until it became apparent that the vessel was lifting anchor the morning of July 14. At that point, Flint sent a fax to Beekman on board the *Arctic Sunrise* asking him to verify that he had told Sorensen the DEC wanted the vessel to remain in port.

Sorensen argues that, in light of the State's failure to rebut evidence that the master of a vessel is not normally involved with regulatory compliance, no reasonable juror could conclude beyond a reasonable doubt that his conduct was a gross deviation from the standard of care. We agree with respect to Sorensen's conduct on July 12, before Sorensen had actual notice that the vessel was in violation. The unchallenged evidence was that SMS handled regulatory paperwork for the *Arctic Sunrise* and that this was typically how things were done in the industry. In light of this evidence, Sorensen's years of experience as a master would not have alerted him to a duty to inquire about Alaska's environmental regulations, but rather would have firmed his belief that such an inquiry was unnecessary. The jury's conclusion to the contrary was purely speculative—because the State offered no concrete evidence to show that Sorensen's reliance on SMS was unreasonable.[20] For this reason, we conclude that there was insufficient evidence for the jury to find beyond a reasonable doubt that Sorensen's conduct on July 12 was criminally negligent. We therefore affirm Judge Miller's decision to set aside Sorensen's convictions for his conduct on that date.

■ The State next argues that Sorensen was criminally negligent on July 14 because, after he learned the vessel was operating in violation of state law, he continued on his mission and ignored Schorr's request to return to Ketchikan.

The *Arctic Sunrise* left Ketchikan at about 9:00 a.m. on July 14. Sorensen knew there was some risk the vessel was still in violation. But he testified that he "had the impression from Mr. Beekman that while the wheels were turning we were all right to go, as long as [the regulatory process] . . . was progressing." He said he knew on July 13 that the vessel was out of compliance, but that he "worked under the assumption that [this fact] . . . did not prevent me from leaving." At trial, the State conceded that Sorensen did not depart Ketchikan until after Beekman told him the vessel was "good to go."

Not long after the vessel left the Ketchikan port, Beekman called Sorensen on the ship's mobile phone, but Sorensen was maneuvering in port and could not take the call. The conditions were foggy and there was a cruise ship approaching from the west. About thirty minutes later, when the vessel was in Tongass Narrows, Sorensen called Beekman back. Sorensen testified that Beekman may have told him at that point to turn back, but Sorensen said it was not feasible to do so because the vessel was in a narrow passage and visibility was poor.

Several hours later, when the ship was in Nichols Passage east of Gravina Island, Sorensen received a copy of the DEC's notice of violation, which was faxed to the vessel. At about the same time, the ship's radio operator gave Sorensen a copy of the letter Flint had faxed to Beekman earlier that morning asking the vessel to stay in port. Sorensen called Schorr at the DEC at about 11:30 a.m. According to Flint, who listened in on the conference call, Schorr asked Sorensen to return to Ketchikan. Flint said Schorr was "very adamant, the fact that this was the state law, they needed to go back."

Schorr remembered the conversation differently. She said she told Sorensen that he was in violation of state law and asked him

---

**20.** *See Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir.1984) (citing *Brady v. Southern Railway*, 320 U.S. 476, 480, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)) (other citations omitted) (a court will reinstate a jury verdict after the grant of a judgment of acquittal only if the evidence provides "a sufficient basis from which the jury could have reasonably reached a verdict without speculation or drawing unreasonable inferences which conflict with the undisputed facts").

what his intentions were. Schorr said Sorensen told her the vessel was headed to Cordova Bay. Schorr asked him his estimated time of arrival, and he said about four hours. The satellite phone connection was then cut off. The vessel's radioman called back and gave Schorr the vessel's satellite phone number and apologized for the vessel's unintended violation. Schorr testified that she did not tell Sorensen to return to Ketchikan because she did not have the authority to do so. She also testified that her notes of the conversation did not indicate that she asked Sorensen to turn back.

Although the evidence on this point (*i.e.*, whether state officials directed Sorenson to return to port) is conflicting, the question is whether the evidence, viewed in the light most favorable to upholding the jury's verdict, is sufficient to support the jury's decision.[21] Viewing the evidence in this light, even though Sorenson was initially told by Beekman that he was "good to go," Sorenson knew by 9:30 a.m. at the latest (after speaking to Beekman on the ship's mobile phone) that the vessel was out of compliance, and, at least according to Flint's version of the later conversation between Sorenson and the DEC, Sorenson was "strongly advised" by state officials at 11:30 a.m. to turn the vessel around and head back to Ketchikan—something he did not do.

Given Schorr's conflicting testimony about this same conversation, it is arguable that the jury's view of this incident is against the weight of the evidence—but that is not the question before us.[22] Rather, the issue presented to us is whether the evidence is sufficient to support the jury's verdict when viewed in the light most favorable to the jury's verdict. Under that test, the evidence is sufficient, and we therefore direct the district court to reinstate the jury's verdict.

Sorensen argues that his conviction should nevertheless be overturned because it was SMS, not him, that had the duty to obtain DEC approval of an oil spill contingency plan.

Alaska Statute 46.04.055(f) prohibits operating a nontank vessel without an approved oil spill contingency plan. But the duty to file an application for an oil spill contingency plan with the DEC is established by regulation:

(a) . . . .

A person who is subject to AS 46.04.055(f) must file an application for approval of a nontank vessel plan as required under 18 AAC 75.400–18 AAC 75.420 and meet the applicable requirements of 18 AAC 75.426–18 AAC 75.496. The application must be made

. . . .

(5) for a nontank vessel, by

(A) the charterer, if the nontank vessel is chartered by demise;

(B) the operator;

(C) the owner, if the agents or employees of the owner retain control and responsibility for the operation of the nontank vessel; or

(D) in any other case, the person with primary operational control[.] [23]

Sorensen argues that under this regulation only one person or entity is responsible for obtaining DEC approval of an oil spill contingency plan. He argues that an operator under (B) has that duty only if there is no responsible party under (A)—that is, only if the vessel is not chartered by demise (bareboat charter).

Having reviewed the regulatory history,[24] we think Sorensen is probably correct. As originally drafted,[25] this regulation by its

---

21. *See Dorman v. State,* 622 P.2d 448, 453 (Alaska 1981); *Pease v. State,* 54 P.3d 316, 331 (Alaska App.2002).

22. *See New v. State,* 714 P.2d 378, 381–82 (Alaska App.1986) (discussing and distinguishing different standards that apply to appellate review of the sufficiency of the evidence to support a verdict versus a motion for a new trial on the ground that the verdict is against the weight of the evidence).

23. 18 Alaska Administrative Code (AAC) 75.400.

24. We reviewed the history of the regulation governing tank vessels, which served as the model for the regulation governing of nontank vessels.

25. *See* DEC, Public Comment Markup Draft of 18 AAC 75 (Sept. 27, 1991).

plain language listed a hierarchy of mutually exclusive categories.[26] If the vessel was chartered by demise (that is, bareboat charter), the charterer was the responsible party. If not, the owner was the responsible party—assuming the owner or the owner's agents retained control over and responsibility for the operation of the vessel. In all other cases, the person with "primary operational control" was the responsible party.

The drafters did not add the "operator" subsection until late in the rule-making process, when the DEC issued its final agency draft.[27] This change disrupted the clear structure of the regulation, making it ambiguous. An "operator" as defined in AS 46.04.900 is a person who "exerts general supervision and control" over a vessel. That definition includes the person or entity that leases the vessel, the vessel's master, the master's employer, or any other person who, through an agent or contractor, undertakes "the general functioning" of the vessel.[28] This broad definition potentially overlaps with every other listed subsection: an operator under (B) might also be the charterer under (A) or the owner under (C) and, by definition, will always the person with "primary operational control" under (D).[29] And yet (D) provides that the person with "primary operational control" has *no* duty to file an application unless none of the other subsections identifies a responsible party.[30] We think it likely that the drafters' intent was to insert the "operator" of the vessel higher in the hierarchy of persons with a duty to file an oil spill contingency plan application—not to eliminate the previously cohesive structure of the regulation.

But Sorensen was not convicted of violating the regulatory duty to obtain DEC approval of an oil spill contingency plan. He was convicted under AS 46.04.055(f) of operating the *Arctic Sunrise* with criminal negligence as to whether a contingency plan was on file with the DEC. Arguably, in convicting Sorensen of this offense, the jury was influenced by the jury instructions and argument suggesting he had a legal duty to file an oil spill contingency plan. The jurors may have found that Sorensen was criminally negligent in operating the *Arctic Sunrise* without an oil spill contingency plan at least in part because they concluded he had a legal obligation to obtain DEC approval of such a plan. But Sorensen did not argue at trial that he had no duty, as a matter of law, to file an oil spill contingency plan. And he did not object to the jury instructions or argument suggesting he had such a duty. Nor has he argued on appeal that the court committed plain error. We therefore do not decide this claim.

The trial record suggests that Sorensen reserved his right to pursue post-trial motions in district court in the event he did not prevail on his motion for judgment of acquittal. After the jury returned its verdicts, Sorensen's attorney indicated he had post-trial motions to file. Judge Miller told Sorensen he would allow additional time for post-trial motions if he denied the defendants' motions for judgment of acquittal. Because the trial court granted those motions and set aside the jury's verdicts, no post-trial motions were filed.

Criminal Rule 33(c) provides that a motion for new trial "shall be made within 5 days after verdict or finding of guilt, or within such further time as the court may fix during the 5–day period." Because Sorensen preserved his right to file post-trial motions, he must be allowed to do so when his case returns to the district court.

Given the procedural posture of this case, Sorensen's cross-appeal claims are not ripe for review. Because we have affirmed Judge Miller's decision setting aside the verdicts

---

**26.** IA Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 21:14, at 181–82 (6th ed.2002 revision) ("Generally, courts presume that 'or' is used in a statute disjunctively unless there is clear legislative intent to the contrary.").

**27.** *Compare* DEC, Public Comment Markup Draft (Oct. 11, 1991) *with* DEC, Final Agency Draft (Oct. 26, 1991).

**28.** AS 46.04.900(16).

**29.** 18 AAC 75.400(a)(5).

**30.** 18 AAC 75.400(a)(5)(D).

against Greenpeace, Inc., its claims on cross-appeal are moot.

*Conclusion*

We AFFIRM the district court's decision setting aside the jury's verdicts against Greenpeace, Inc., for its conduct on July 12 and July 14 and against Sorensen for his conduct on July 12. We REVERSE the district court's decision setting aside the jury's verdict against Sorensen for his conduct on July 14. The case is remanded to the district court for further proceedings consistent with this opinion. We do not retain jurisdiction.